UNITED STATES of America, Appellee,

v.

Manuel CASTILLO and Juan Fernandez, Appellants.

Nos. 577, 578, Dockets 90–1342L, 90–1354.

United States Court of Appeals, Second Circuit.

Argued Dec. 4, 1990.

Decided Feb. 4, 1991.

**1228**

Mark B. Gombiner, The Legal Aid Soc., New York City for defendant-appellant Manuel Castillo.

Stewart Leigh Orden, Orden & Cohen, New York City, for defendant-appellant Juan Fernandez.

Jonathan Rosenberg, Asst. U.S. Atty. (Otto G. Obermaier, U.S. Atty., of counsel), S.D.N.Y., for appellee.

Before NEWMAN and WINTER, Circuit Judges, and DALY, District Judge.[1]

---

**1.** Honorable T.F. Gilroy Daly, of the United States District Court for the District of Connecticut, sitting by designation.

DALY, District Judge:

Manuel Castillo and Juan Fernandez appeal from judgments of conviction entered in the United States District Court for the Southern District of New York, Shirley Wohl Kram, *Judge,* following a jury trial. Appellants were each found guilty on all counts of a four-count indictment charging them with conspiracy to distribute cocaine in violation of 21 U.S.C. § 846; distributing cocaine within 1,000 feet of an elementary school in violation of 21 U.S.C. §§ 812, 841(a), 841(b)(1)(C), and 845a(a); possessing cocaine with intent to distribute within 1,000 feet of an elementary school in violation of 21 U.S.C. §§ 812, 841(a), 841(b)(1)(C), and 845a(a); and using or carrying a firearm during and in relation to the commission of a drug trafficking offense in violation of 18 U.S.C. § 924(c).

Fernandez contends on appeal that 1) the evidence was insufficient to support his conviction under count four, the firearm charge; 2) that the district court erred in admitting expert testimony as to the purported practices of drug dealers in Washington Heights; and 3) that the district court improperly increased his offense level by three points on the ground that the undercover officer on the case was an "official victim" as defined in the sentencing guidelines. U.S.S.G. § 3A1.2(b).[2] Castillo joins in Fernandez's argument as to the impropriety of the upward sentencing adjustment and raises his own objections to the admission of the expert testimony regarding the Washington Heights drug dealers.

For the reasons set forth below, we reverse and remand the judgments of the district court on count four and vacate and remand the sentencing determinations.

## BACKGROUND

Appellants' convictions stem from a July 10, 1989 drug sale in the Washington Heights section of Manhattan to undercover officer Shawn Johnson of the Manhattan

---

**2.** Fernandez also joins in the "relevant and consistent" arguments raised by appellant Castillo. *See* Fed.R.App.P. 28(i).

North Tactical Narcotics Team ("TNT"). Although a "beat cop" for two and a half years, the "buy and bust operation" in question was only Johnson's second assignment as an undercover officer with TNT. At approximately 3:00 p.m. that day, he arrived in the vicinity of 164th Street and Amsterdam Avenue, accompanied by a field team. Consistent with his cover as a casual drug user in search of a purchase, Johnson was attired in a T-shirt and blue jeans, carrying a substantial amount of prerecorded buy money, and not armed with a gun or wired with any transmitting or recording devices. After twice walking alone by a group of six or seven males standing on West 164th Street, Johnson was approached by appellant Juan Fernandez. Following an initial exchange, Fernandez told Johnson that "he had good shit," which Johnson understood to mean cocaine. After some discussion, the two agreed on a sale of three grams of cocaine for $90.00.

Fernandez then led Johnson across the street to 545 West 164th Street and to the door of apartment 1D. A short time later, appellant Manuel Castillo, who had been standing nearby during the sidewalk conversation, arrived and unlocked the door. After the three entered the apartment, Fernandez locked and bolted the door behind them. The apartment appeared to be vacant and the only furniture Johnson testified to seeing was a small table and chair located in the room to which he had been brought by Fernandez and Castillo. Next to the chair was a shopping bag, and on the table stood a triple-beam balance scale.

Castillo sat behind the table and confirmed the quantity and price of cocaine, while Fernandez stood behind Johnson. Castillo then picked up a small plastic bag containing white powder and, using a small index card and the scale, measured out approximately three grams of cocaine. While he was doing this, Fernandez left the room for approximately one minute. When he returned, Johnson observed a medium-

to-large bulge in his waistband, appearing from its contours to be the top portion of a gun. Johnson gave Fernandez $90 for the cocaine, took a tinfoil package from Castillo, and attempted to leave the apartment. Fernandez prevented him from doing so, putting his hand on Johnson's chest and saying "no". Fernandez then lifted his shirt to display what appeared to be a gun and placed his finger on the trigger. Johnson testified that the gun was a "medium to large" frame, large caliber, dark revolver with dark wooden grips and seemed to be "banged up."

After seeing the gun, Johnson said "yo, money, everything is cool," and again tried to leave the apartment. Fernandez, keeping his hand on the gun's handle, still tucked in the waistband, again said "no". After speaking to Fernandez in Spanish, Castillo approached Johnson with an index card containing cocaine and one of the two men ordered Johnson to "check it out." [3] Johnson replied that he had no desire to get "high" at the moment because he was going to "party" later on. Once again he tried to leave the apartment but Fernandez stopped him, pulling the gun a little further out of his waistband, his finger still on the trigger, and exposing "an inch or so of the barrel". Castillo then placed the card with the cocaine directly under Johnson's nose, while Fernandez told him to snort it. Believing Fernandez would shoot him if he did not snort the cocaine, Johnson injested it. Fernandez said "yo, you cool bro," and proceeded to unlock and unbolt the door, allowing Johnson to leave with the tinfoil package of cocaine.

Castillo and Fernandez were arrested minutes later by the field team near the front of 548 West 164th Street. The police recovered $385.00 from Castillo, including $80.00 of the prerecorded buy money. Neither Castillo nor Fernandez had a gun on his person and no gun was found in apart-

---

**3.** Both the government and Castillo write in their respective briefs that it was Fernandez who ordered Johnson to "check it out." Fernandez attributes the remark to Castillo. Because the full transcript of this eight-day trial was not made part of the record on appeal, we are unable to ascertain which version is correct.

ment 1D, the area outside its windows or in the vicinity of the arrest.[1]

## DISCUSSION

### 1. Sufficiency of the Evidence

Fernandez contends that the evidence presented at trial was insufficient to support his conviction for carrying or using a firearm in relation to a drug trafficking crime. 18 U.S.C. § 924(c). We disagree.

■ The rules for determining appellate sufficiency claims are well settled. The standard of review is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *See United States v. Chang An–Lo*, 851 F.2d 547, 553–54 (2d Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). The verdict must be sustained if there is substantial evidence to support it. *See United States v. Fiore*, 821 F.2d 127, 128 (2d Cir.1987).

■ Fernandez submits that the jury could not have found beyond a reasonable doubt that the object that Johnson saw was a firearm within the meaning of 18 U.S.C. § 924(c).[5] He urges that, because the gun was never recovered, despite a search of appellants' persons, apartment 1D, the area outside its windows, and the area near where appellants were arrested, "whether the object seen by Johnson was actually a weapon designed, or which could readily be converted, to expel a projectile by the action of an explosive within the meaning of § 921(a)(3), as opposed to being a toy or other replica of such an item, was not within the government's ability to prove by any standard, let alone beyond a reasonable doubt." Fernandez Brief at 15.

Fernandez's argument is not persuasive. Viewed in the light most favorable to the Government, the permissible evidence at trial established the following: 1) that Johnson had extensive training and familiarity in the identification and use of firearms; 2) that Johnson was close enough to the object in Fernandez's waistband to see and describe all of the gun except the lower portion of the barrel, including the gun's handle, cylinder, trigger, and hammer; and 3) that Johnson believed the gun to be operable and not a toy.

The jury's verdict in view of such evidence can hardly be considered irrational. The jurors could have reasonably found that Johnson's testimony was credible and that the object he saw was, in fact, a firearm. They could have accepted the inference that appellants disposed of or hid the gun in an area never searched in the brief interval between the drug deal and their arrest. Although it is not inconceivable that the object Johnson saw was a sophisticated toy gun or other facsimile falling outside the firearm definition, we are not prepared to find that such a possibility constitutes necessarily a reasonable doubt.[6]

In summary, a rational trier of fact could have found Fernandez guilty of using or carrying a firearm during and in relation to the commission of a drug trafficking offense, and we accordingly accept the verdict rendered by the jury that appellant was guilty as charged in that regard.[7]

---

**4.** Although appellants characterize the search of the apartment as "thorough", the government describes it as "brief", noting that the officers "never looked [for the gun] underneath floorboards or in the ceiling, places where, according to a veteran narcotics investigator, drug dealers often hide guns." Gov't Brief at 6. Again, in the absence of a full transcript, we cannot ascertain which version is the more accurate one.

**5.** "Firearm", as employed in § 924(c), is defined as follows:
(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any

such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.
18 U.S.C. § 921(a)(3).

**6.** Nor was the Government required to disprove this possibility. *See Fiore*, 821 F.2d at 128 (citations omitted) ("the government [is not] required to preclude every reasonable hypothesis which is consistent with innocence.").

**7.** We cannot allow an error on the Government's part to pass unnoticed. The Government writes in its brief that it was on the basis of his close look at the gun and his extensive training

## 2. Expert Testimony

Appellants argue that the district court erred in admitting as expert the testimony of Detective Hector Santiago about the purported methods of Washington Heights drug dealers. Specifically, appellants contend 1) that the subject matter at issue was inappropriate for expert testimony; and 2) that even if properly admitted, the expert testimony was employed not for the permissible purpose of assisting the jury to understand the facts at issue, but rather for the impermissible purpose of encouraging the inference of appellants' guilt from the behavior of unrelated persons.[8] We agree that the testimony was improperly admitted.

Santiago was ostensibly offered as an expert witness "regard[ing] the distribution of cocaine in the Washington Heights area of Manhattan." Castillo App. at 84. At the time of his testimony, he was an eight-year veteran of the Police Department, with three years experience as a narcotics officer in Washington Heights. Over objections as to his expert qualifications, Santiago testified to the typical operating methods of Washington Heights drug dealers, describing their work apartments and the materials typically found within these apartments, including scales, tinfoil, plastic sandwich bags, plastic playing cards and guns.

The testimony was peppered with statistical accountings of Santiago's experiences as a narcotics investigator in Washington Heights from May of 1986 to the time of his testimony, including statistics of occasions when drug dealers had used guns to make potential customers sniff cocaine. Santiago explained that this practice had begun in the fall of 1988 and that it was "becoming more and more popular among the drug dealers in the Washington Heights area," as a means of flushing out undercover officers. *Id.* at 104. The technique was, he believed, "used to protect [the dealers] from police officers making undercover buys at that location." *Id.* at 105. When asked how the dealer would use a gun when instructing prospective buyers to snort cocaine, Santiago testified that one common way was to "have a gun in their waistband, and they will either put a hand out on the way and they would hold it to take a hit, or they will go so far as to put the gun to the undercover's head.... They take their hand, the gun is in the waistband, and they will put their hand on the handle." *Id.* at 106.

Santiago testified that in the two years prior to his testimony, he was aware of "well over 25" instances in which narcotics dealers in work apartments instructed prospective buyers to snort cocaine. *Id.* at 103. He testified that approximately twenty of those instances had occurred in Washington Heights. *Id.* He was aware of twelve occasions in which the prospective buyer was an undercover officer, *id.* at 105, and testified that in six of these instances, the dealer had a weapon. *Id.* Five of those instances took place in Washington Heights. *Id.*

At the conclusion of Santiago's direct testimony, Fernandez's counsel moved to strike, arguing that "[a]n expert has to testify on matters that are really subjects for an expert, involving expertise, and he didn't do that.... What the government did with this is to restate its position and sort of put a stamp of approval on it. I think it is improper, and I ask to strike the testimony." *Id.* at 110. The Government responded that the testimony was appropriate insofar as "[t]he jury does not have it within their expertise to know what a work apartment is.... The expert was there to

---

in the use and identification of guns that Johnson testified "that the gun that had been *held to his head* was operable and not a toy." Gov't Brief at 9–10 (emphasis added). In fact, as the prosecutor conceded at oral argument, there was no testimony at trial that any gun was ever held to Johnson's head. Whether attributable to poor drafting or something far worse, we are troubled by the error, particularly when an in-

complete trial transcript has been provided to us.

**8.** Fernandez additionally contends that Santiago's testimony had the effect of increasing in the jurors' minds the magnitude of the drug offenses charged in the indictment. In view of our eventual disposition of this point on appeal, we need not reach this argument.

say what scales are used for by drug dealers, what tinfoil is used for by drug dealers, and guns would be used for by drug dealers." *Id.* at 111. The Court denied the motion to strike, concluding simply that "it is appropriate to have his testimony.... I feel that he is properly qualified, and I am accepting his testimony." *Id.*

A district court may admit expert testimony if it finds that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R. Evid. 702. If the testimony is instead directed solely to "lay matters which a jury is capable of understanding and deciding without the expert's help," *Andrews v. Metro–North Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir.1989), the testimony is properly excludable. The district court has "broad discretion" in such matters, and its decision whether to admit expert testimony under Rule 702 is to be sustained " 'unless manifestly erroneous.' " *United States v. Torres*, 901 F.2d 205, 237 (2d Cir.1990) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir.), *cert denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987)).[9]

Although we have repeatedly affirmed that the operations of narcotics dealers are a proper subject for expert testimony under Fed.R.Evid. 702,[10] we have carefully circumscribed the use of such testimony to occasions where the subject matter of the testimony is beyond the ken of the average juror. *See, e.g., Nersesian*, 824 F.2d at 1308 ("no error in the district court's decision to allow the government to elicit expert testimony ... regarding the parlance of the narcotics trade and the meaning thereof."); *United States v. Brown*, 776 F.2d 397, 400 (2d Cir.1985), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986) (decision to allow expert testimony appropriate where the expert "knew a

good deal more about street narcotics deals in Harlem than did the jurors, who would consequently be 'assisted' by his description of the terms and practices generally used in such sales."); *United States v. Young*, 745 F.2d at 760 (decision to allow expert testimony appropriate where "the Flash Inn incident was sufficiently unusual"); *United States v. Carson*, 702 F.2d 351, 369 (2d Cir.) (citations omitted) (decision to allow expert testimony appropriate where the subject matter, "the clandestine manner in which drugs are bought and sold, is unlikely to be within the knowledge of the average layman."), *cert. denied sub nom. Thomas v. United States*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983). Logically, only in such circumstances would the testimony actually "assist the trier of fact to understand the evidence or to determine a fact in issue" as required under Rule 702. It follows that expert testimony on drug-related matters is unnecessary and properly excludable where " 'all the primary facts can be accurately and intelligibly described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience or observation in respect of the subject under investigation.' " *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962) (quoting *United States Smelting Co. v. Parry*, 166 F. 407, 415 (8th Cir.1909)); *see also Andrews v. Metro North Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir.1989). As stated in the Advisory Note to the Rule itself, " '[t]here is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible

---

9. Even if admissible under Rule 702, expert testimony is still subject to exclusion under Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice...." *See United States v. Young*, 745 F.2d 733, 765 (2d Cir.1984) (Newman, J., concurring), *cert. denied sub nom. Myers v. United States*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).

10. *See, e.g., United States v. Roldan–Zapata*, 916 F.2d 795, 805 (1990); *Torres*, 901 F.2d at 237, *United States v. Diaz*, 878 F.2d 608, 616–18 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989).

degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.'" Fed.R.Evid. 702 advisory committee's note (quoting *Ladd, Expert Testimony*, 5 Vand.L.Rev. 414, 418 (1952)). We conclude that in the present case, the jury was entirely capable of understanding the evidence before it and determining the facts in issue without Santiago's assistance. As such, the district court erred in denying the motion to strike.

■ Simply stated, we are not convinced that New York jurors in today's climate, flush with daily news of the latest drug bust, need an expert to enlighten them as to such elementary issues as the function of a scale or index card in a drug deal.[11] The need is even less apparent when an eye-witness, as in this case Officer Johnson, has already explained or described the relevant procedures and equipment. In this regard, we concur with Castillo's assessment of Santiago's testimony:

> The jury hardly needed Detective Santiago to inform them that scales are used to weigh drugs after hearing Officer Johnson testify that the drugs he purchased were weighed on a scale. Nor did they require an expert to figure out that drug dealers use keys to open the locks on apartment doors when Johnson stated that Castillo opened the door with a key. The other aspects of Santiago's expert explanations (drugs are kept in plastic bags; drugs are wrapped in tinfoil; drugs are sold out of vacant apartments; drug dealers put their hands on guns stuffed in their waistband and make customers snort cocaine) were equally apparent [from Johnson's testimony] without the elaborations of an expert.

Castillo Brief at 17–18. We are equally confident that the purpose of forcing customers to snort cocaine—to flush out undercover police officers—was the most obvious, and indeed, perhaps only realistic explanation for the practice and certainly well within the reach of any juror's common sense.

Insofar as the jury was capable of understanding the evidence and determining the facts in issue without Santiago's testimony, we conclude that that testimony was erroneously admitted under Rule 702. In so holding, we obviate an otherwise necessary inquiry into whether, under Fed.R.Evid. 403, the testimony's "probative value [was] substantially outweighed by the danger of unfair prejudice." *See supra* note 9.[12]

We now turn to the question of whether the court's error warrants reversal of appellants' convictions on count four. "As a general proposition, an error with respect to admission of evidence will result in reversal of a conviction if it had 'substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Castro*, 813 F.2d 571, 577 (2d Cir.), *cert. denied*, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). We conclude that, in the wake of the Government's summation, Santiago's testimony could only have had such substantial and injurious effect on the jury's count four verdicts, and that reversals of the count four convictions are therefore required.

The Government successfully opposed the motion to strike by telling the court that Santiago's testimony was offered only as an aid to the jury in "understanding the facts of this case." In fact, as became all

---

**11.** In *United States v. Long*, 917 F.2d 691, 702 (1990) (Winter, J.), this Court voiced similar skepticism regarding the need for an expert witness to explain the most elementary concepts of certain well-publicized criminal schemes. As there noted, "[t]he sharing of the proceeds from illegal kickback schemes with those who facilitate them is hardly a unique arrangement.... Indeed, recent *highly-publicized* scandals in New York City have involved payments to political leaders in exchange for their services as facilitators of corrupt schemes. *We do not believe that a New York jury needs expert testimony to*

understand that those who facilitate or broker kickback schemes may expect a commission from the proceeds." *Id.* (citations omitted) (emphasis added).

**12.** Clearly, however, the above analysis manifests our conviction that the testimony was of minimal probative value, if any. The following analysis further reveals our belief that there was a danger of unfair prejudice arising from its admission.

too apparent in the government's summations, the purpose of the testimony was actually to corroborate Johnson's testimony and provide a foundation for what we conclude to be an improper guilt by alleged association argument. The Government's summation and rebuttal summation are replete with undisguised exhortations to convict the appellants on the firearm charge on the basis of the following syllogism: 1) drug dealers use guns to force their customers to ingest cocaine so they can determine whether or not they are cops; 2) Castillo and Fernandez are drug dealers; 3) ergo, Castillo and Fernandez used a gun to force Johnson to ingest cocaine. Excerpts from the summations are cited below:

And Detective Santiago told us that when these drug dealers instruct their customers to snort the cocaine, they use a gun. They commonly use a handgun. How do they most commonly use that handgun? By having it in their waistband, just like this, just the way Officer Johnson testified that Juan Fernandez had the handgun, and by ordering the officer to snort the cocaine. In other words, the defendants in this case acted the way *every* good drug dealer in Washington Heights acts in the normal course of events.

Castillo App. at 144 (emphasis added).

And why is there so much corroboration for [Johnson's] testimony. . . . [I]s it just coincidence that Detective Santiago has found in his vast experience in the Washington Heights area that drug dealers just like the defendants use work apartments all the time to sell drugs and before they let the customer leave the apartment, *they hold a gun to him, and they force him at gun point to ingest cocaine.* Ladies and gentlemen, if Officer Johnson's testimony is a lie, how come it rings so true?

*Id.* at 145 (emphasis added).[13]

And Officer Johnson told us all about the gun. He told us its size, its color, its condition, its parts, its caliber. Just like *any* good drug dealer worth his salt in Washington Heights, the defendants had a gun, and they used that gun in their work apartment to find out if their customer would pass the snort test.

*Id.* at 152 (emphasis added).

Ladies and gentlemen, you have seen from the evidence in this case that basically what we have are drug dealers. And we know from the testimony of Detective Santiago that drug dealers carry guns, drug dealers hide guns, drug dealers use guns in work apartments, drug dealers use guns to force their customers to ingest cocaine so they can determine whether or not they are cops. And these defendants are drug dealers.

*Id.* at 160.

It is not difficult to convict these drug dealers of having a gun that Officer Johnson said they used and that the drug dealers *throughout this community use all the time* to force their customers to ingest cocaine. It's important but it's not difficult. It is not difficult to convict these drug dealers of having a gun that Officer Johnson said they used and that the drug dealers *throughout this community use all the time* to force their customers to ingest cocaine.

*Id.* (emphasis added).

Aside from the obvious mischaracterization of Santiago's testimony,[14] we take serious issue with the Government's use of an expert witness to propound the impermissible theory that appellants' guilt could be inferred from the behavior of unrelated persons. We conclude that the government's misuse of what was, in any event, improperly admitted testimony, could only have had a substantial and injurious effect on the jury's count four verdicts. The firearm count was perhaps perceived as weak from the case's inception—no gun had ever

---

13. Apparently, the Government found this excerpt from the summation so beguiling that it eventually found its way into the Government's brief as the misrepresentation discussed at *supra* note 7.

14. Santiago did not testify that *all* drug dealers forced potential customers to snort cocaine at gunpoint. To the contrary, he testified he was aware of six such instances, five of which occurred in Washington Heights. *See supra* p. 1231.

been recovered, despite searches of appellants' persons, the apartment, the area outside the apartment windows and the vicinity of the arrest. *But cf. supra* note 4. The initial arrest report contained no mention of any weapon.[15] Finally, there was only one witness who testified to having seen the gun, Officer Johnson.[16] The jury's notes to the Judge during deliberations, manifesting their recognition that, in fact, the firearm count was troubling, are telling. *See* Castillo Brief at 15–16 (quoting the jury's notes). The first note asked to review Detective Bailey's "answers to the questions ... as to why a gun was not mentioned in the worksheet." On the second day of deliberations, the jury requested to rehear all of Officer Johnson's testimony about the gun. Later that same day, the jury sent out a note asking whether they had to "have unanimous agreement on all charges. May we have unanimous agreement on 1, 2 and a hung jury on one or two other charges." In view of the evidence on the count, the jury's obvious struggle, and the absence of any curative instruction from the court,[17] we hold that the government's misuse of Santiago's testimony by its introduction, and heavy reliance on it in summation, improperly tipped the balance against appellants on the firearm charge.

As set forth above, we hold that the district court erred in retaining Santiago's testimony in the face of the motion to strike. When coupled with the improper appeal in the prosecutor's summation and rebuttal summation, and as evidenced by the questions from the jury, the error had substantial and injurious effect on the jury's verdicts. Reversals on the count four convictions are therefore in order, with those counts remanded to the district court for retrial.

### 3. The Sentencing Determination

Appellants argue that the district court improperly increased their offense level by three points upon a determination that Johnson was an "official victim" under the guidelines. U.S.S.G. § 3A1.2(b).[18] In an April 23, 1990 letter submitted to Judge Kram in connection with the sentencings in the case, the Government urged the increased assessment on the following grounds:

[A]lthough the defendants did not know for sure that Officer Johnson was a police officer, they held the cocaine up to his nose and the gun to his torso precisely because they had "reasonable cause to

**15.** Detective Bailey, who filled out the arrest report, did not charge either appellant with possession of a weapon. According to Castillo's brief, Bailey and a Lieutenant Krajci "attempted to excuse this omission by asserting that New York State law requires a weapon to be recovered in order to lodge a charge of weapons possession. A charge of gun possession was lodged only after Bailey and Krajci learned 'the case was going federal.'" Castillo Brief at 8 (citations omitted).

**16.** Johnson may have been something less than a commanding witness. The district court observed that he was "apparently a young policeman and has never been subjected to cross examination. He was very shaken...." *See* Fernandez Brief at 21 n. 15.

**17.** This Court has previously noted that "[b]y sustaining a defendant's objection, or perhaps ordering that the remarks be stricken from the record and issuing a cautionary instruction to the jury, a district court can minimize the prejudicial effect of a prosecutor's remarks." *United States v. Nersesian*, 824 F.2d 1294, 1329 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). No objection was raised to

the prosecutor's summation in this case. Nonetheless, neither of the other curative devices mentioned were employed by the district court. The charge as to expert witness testimony was relatively standard, devoid of cautionary words as to the impropriety of the Government's summation. *See* Castillo App. at 17–18; *compare United States v. Bubar*, 567 F.2d 192, 200 (2d Cir.) (footnote omitted) (citations omitted) (no prejudice from prosecutor's rebuttal summation resulting to appellants where, *inter alia*, "any conceivable misunderstanding on the part of the jury was nipped in the bud by Judge Newman's emphatic curative instructions given first sua sponte...."), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977).

**18.** Section 3A1.2(b) provides for a three level adjustment if:

during the course of the offense or immediate flight therefrom, the defendant or a person for whose conduct the defendant is otherwise accountable, knowing or having reasonable cause to believe that a person was a law enforcement officer or corrections officer, assaulted such officer in a manner creating a substantial risk of serious bodily injury.

believe" he was an undercover officer. Indeed, defendant Fernandez had less than two months prior to this offense been arrested by New York City Police for having sold cocaine to an undercover officer. Moreover [sic], as Detective Santiago testified, it has become basically standard operating procedure for drug dealers to force prospective buyers, including a substantial number of undercover police officers, to take the "snort test" at gunpoint. They do this precisely because they have "reasonable cause to believe" that any potential buyer is an undercover police officers [sic].

Fernandez App. at 57. The Government submitted that appellants' conduct—"holding a gun to Officer Johnson" [19] and "forcing Officer Johnson to snort cocaine"—constituted an "assault ... in a manner creating a substantial risk of serious bodily injury" warranting an increase under § 3A1.2(b). *Id.*

The court accepted the official victim adjustment, explaining its finding as follows:

> I believe that they did assault this officer. In effect, they threatened him with serious bodily injury. I *think* that they did *believe* that there was a *possibility* that he might be a police officer. Apparently the defendant Fernandez had previously been arrested by an undercover cop and so I think that they were being very careful on this account.

*Id.* at 85 (emphasis added).

 We conclude that such finding was an inadequate basis for awarding the three level increase. Section 3A1.2(b) explicitly conditions the increase on the factual determination that the defendants committed such assault "knowing or having *reasonable* cause to believe that a person was a law enforcement or corrections officer." U.S.S.G. § 3A1.2(b) (emphasis added). There is no room for ambiguity in its reading. Yet here, the court concluded only that "they did believe that there was a

possibility that he might be a police officer."

The stated conclusion that "[appellants] did believe that there was a possibility that he might be a police officer" plainly does not amount to the required finding that appellants acted "knowing or having reasonable cause to believe that a person was a law enforcement officer or corrections officer." U.S.S.G. § 3A1.2(b). The court's analysis on this point is devoid of any finding of reasonableness; if anything, the use of the words "possibility" and "might" belies such a finding. The word choice suggests instead that whatever belief appellants did have was more the product of speculation than the product of reasoning. Because we conclude that the court's stated reasons for the increase do not satisfy the requirements of the section, and that the determination as such was an incorrect application of the guidelines, we vacate the sentences and remand to the district court for further sentencing proceedings. *See* 18 U.S.C. § 3742(f)(1).

## CONCLUSION

For the reasons set forth above, the convictions on count four are reversed and those matters are remanded to the district court for retrial. Additionally, the sentencing determinations as to both appellants are also vacated and reversed and those matters remanded to the district court for re-sentencing.

---

**19.** This characterization, along with the earlier statement in the Government's letter that "the defendants forced an undercover police officer to snort cocaine at gunpoint", Fernandez App. at 57, is again misleading. *See supra* note 7. There was no evidence at trial that the gun was ever "pointed" at Johnson.