38 F.3d 1217
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Guadalupe GONZALEZ and Moises Salazar, Defendants-Appellants.
 Nos. 93-1995, 93-2399.
 United States Court of Appeals, Sixth Circuit.
 Oct. 21, 1994.
 
 Before: CONTIE, MILBURN, and DAUGHTREY, Circuit Judges.
 PER CURIAM.
 
 
 1
 The defendants-appellants, Guadalupe ("Lupe") Gonzalez and Moises Salazar, were convicted of conspiring with Hector Leopoldo-Jose Guajardo (also known as Hector Zapata), Noel Cintron, and Leonardo ("Primo") Guajardo-Froto to distribute cocaine and of conspiring with Zapata to distribute marijuana. In addition, Salazar was also convicted of possession of marijuana with intent to distribute. On appeal, Gonzalez and Salazar challenge the sufficiency of the evidence to support their conspiracy convictions and the length of their sentences. We find no error in connection with the issues they raise, but we remand for the correction of a technical error in Salazar's sentencing order.
 
 
 2
 In March 1991, the Drug Enforcement Administration conducted an investigation into cocaine and marijuana sales in the Dearborn-Detroit area. As part of that investigation, Special Agent Richard Fling posed as a narcotics purchaser and made the acquaintance of Noel Cintron. On March 2, 1991, Cintron sold Fling a one-quarter ounce sample of cocaine for $325. At trial, Cintron testified that he had obtained the cocaine from Lupe Gonzalez, whom he had met through his half-sister, Michelle Jimenez. Cintron also confirmed Fling's testimony that on April 25, 1991, he sold the agent an ounce of cocaine for $1,000; Cintron further admitted that he had obtained that cocaine from Lupe Gonzalez.
 
 
 3
 From May 1991 through early January 1992, Fling purchased an additional four ounces of cocaine from Cintron for a total of $3,300. Cintron testified, however, that the controlled substances sold at those times were not obtained from Gonzalez, but rather from his half-sister, Michelle Jimenez.
 
 
 4
 During the same time period that Fling was cultivating a buyer-seller relationship with Cintron, another DEA special agent, David Buckel, was making undercover drug buys from Ramone ("Moncho") Salinas. On July 24, 1991, Buckel purchased four ounces of cocaine from Salinas for $3,450. Other DEA agents assigned to a surveillance detail associated with Buckel's drug buys observed Salinas visit a residence at 1201-1203 Green Street, the official residence of Moises Salazar, both before and after meeting with Buckel to sell the cocaine.
 
 
 5
 On August 21, 1991, the surveillance team again observed Salinas visit the Green Street address prior to and after selling Buckel four and one-half ounces of cocaine for $4,400. Moreover, the agents saw the occupants of a blue pickup truck registered to Salazar enter Salinas's home on that date and later speak with Salinas at the Green Street address.
 
 
 6
 On December 9, 1991, Buckel made arrangements to purchase one kilogram of cocaine from Jose ("JoJo") Cabrera for $27,000. When Buckel arrived at the designated spot for the transaction, Cabrera was accompanied by Baltizar Garcia-Salinas. Eventually, however, the three men drove to a Detroit residence where the cocaine was transferred in exchange for the $27,000. After the consummation of that drug deal, arrests of the individuals involved in the transaction were made. Information was later received that indicated that Cabrera and Baltizar Garcia-Salinas obtained the cocaine that was sold to Buckel on December 9, from Jose Antonio Bolanos-Ramirez who, in turn, had been paid $500 to deliver the kilogram of cocaine from Perez-Castro to the Detroit address where Buckel, Cabrera, and Garcia-Salinas waited for him. Bolanos-Ramirez further testified at trial that he observed Lupe Gonzalez hand the kilo of cocaine to Perez-Castro earlier on December 9.
 
 
 7
 At trial, defendant Moises Salazar was tied to the kilo of cocaine sold to Buckel through documentary evidence and through a statement made by defendant Lupe Gonzalez to Michelle Jimenez. Records seized by DEA agents from the residence of Salazar's partner, Hector Zapata, included notations containing the name "Lupe" followed by the figure "15,500." Moreover, damaging testimony provided by Jimenez indicated that Lupe Gonzalez had expressed concern to her in February or March 1992 because Gonzalez still owed Moises Salazar approximately $15,000 for a kilo of cocaine that had been confiscated by DEA agents during an earlier drug raid on an area house.
 
 
 8
 Michelle Jimenez also offered other testimony tying members of the alleged cocaine and marijuana conspiracies together. Jimenez claimed at trial that she originally purchased marijuana from Lupe Gonzalez in early 1991. Late that same year, Jimenez met both Gonzalez and Moises Salazar at the home of Salazar's girlfriend and purchased two to three pounds of marijuana from Gonzalez for $1,150 per pound. At that time, Jimenez received Salazar's beeper number and began contacting him and purchasing marijuana directly from Salazar at Salazar's home at 1201-1203 Green Street. She testified that she continued to buy marijuana from Salazar until March 25, 1992, when Jimenez was arrested by the DEA and found with one pound of marijuana that had been purchased from Salazar. She also claimed that she purchased marijuana from Salazar at a house on Calvary Street where Hector Zapata lived, and that she had visited Zapata's Calvary Street residence in March 1992 "to pay for some marijuana."[1]
 
 
 9
 Jimenez testified that she and her friend, Denise Parrilla, also began purchasing cocaine from Salazar in late 1991. On the first such occasion, Jimenez and Parrilla received nine ounces of cocaine from Salazar at Salazar's Green Street residence. Although the controlled substances sold for $5,400, Salazar "fronted" the drugs to Jimenez and her friend and allowed them to pay him later for the contraband. At the time of that first cocaine purchase, both Salazar and Zapata were present in the Green Street residence.
 
 
 10
 In November 1991, Jimenez and Parrilla made another $5,400 purchase of nine ounces of cocaine from Salazar at the Green Street home. Again, Zapata was also present at the time of the sale, and Salazar allowed the purchasers to repay him later for the cocaine.
 
 
 11
 In December 1991, Jimenez and Parrilla purchased nine more ounces of cocaine from Salazar at the home of Salazar's girlfriend on Casgrain Street. Because of the inferior quality of the cocaine, however, Salazar charged only $5,100 for the drug. Jimenez testified that she and Parrilla then resold the cocaine to other individuals.
 
 
 12
 Similar nine-ounce sales of cocaine were made from Salazar and Zapata to Jimenez and Parrilla at the Green Street residence in January and February 1992. On those occasions, as in the earlier transactions, Salazar fronted the drugs to the purchasers for later repayment after resale.
 
 
 13
 Jimenez further testified that Salazar and Zapata were partners in the drug trade and that she and Parrilla thus would travel to the Calvary Street home of Zapata and his cousin, Primo Guajardo-Froto, to make their required payments for their prior drug purchases. On one such visit in March 1992, Jimenez and Parrilla were shown four or five kilograms of cocaine by Zapata and Primo and asked "did we know anybody who wanted to buy some, it was good."
 
 
 14
 After her arrest in March 1992, Jimenez agreed to work with the DEA and attempt to tape conversations she had with various members of the Dearborn-Detroit drug trade. On March 27, Jimenez called Salazar and told him she would bring some of her drug payment to him at the Green Street residence. When she arrived there, however, Salazar was not at home. Jimenez then traveled to the Calvary Street home of Zapata and Guajardo-Froto and paid Zapata $2,000. Later, in May 1992, Jimenez called Zapata to inform him she would be bringing another payment to the Calvary Street address. Because Zapata was not at home upon their arrival, however, she proceeded to Salazar's Green Street home. Neither Salazar nor Zapata were present at that house at that time but Primo, who was at the house, offered to accept the payment on Salazar's behalf. Jimenez declined the offer and returned again to Calvary Street where she was then able to pay Zapata $1,000 for fronted drugs.
 
 
 15
 Other evidence adduced at trial included the testimony of DEA agents concerning the items seized from the various residences connected with the drug distribution network. In particular, one agent testified that a phone book retrieved from Salazar's Green Street home contained telephone or beeper numbers for "Lupe," "Moncho," and "JoJo." Furthermore, papers found at the house in which Lupe Gonzalez lived were seized on July 17, 1992, and were found to contain numerous calculations and references to unit prices of an unnamed commodity.
 
 
 16
 DEA Agent Richard Fling was recalled to the witness stand by the prosecution and was qualified as an expert in drug investigations. After being so qualified, Fling testified that the sheets of paper found at Salazar's and Gonzalez's homes were ledger sheets or tally sheets commonly used in the drug trade and represented records and calculations of various illegal drug activities of Salazar and Gonzalez.
 
 
 17
 Based upon the direct and circumstantial evidence of drug dealing and the expert testimony of Fling, the jury convicted both Salazar and Gonzalez of conspiring with others to distribute marijuana and cocaine. In addition, Salazar was also convicted of possession of marijuana with intent to distribute. At the sentencing hearing, the district court calculated the marijuana equivalent of the drugs attributable to the activities of Salazar and Gonzalez and found that the defendants-appellants were subject to sentencing at levels 30 and 26, respectively. In addition, the district judge found that Salazar was the organizer or leader of an offense involving at least two other individuals and was, therefore, subject to an additional two-level enhancement. In light of her applicable criminal history category, Gonzalez was sentenced to concurrent prison terms of 63 and 60 months, followed by concurrent four- and three-year terms of supervised release. Salazar received concurrent prison terms of 120 months, 60 months, and 60 months, followed by concurrent terms of supervised release of five years, three years, and three years.
 
 I. Evidence of Other Bad Acts
 
 18
 Lupe Gonzalez contends that the district court erred in allowing Agent Fling to testify that sheets of computations and notes seized during a July 17, 1992, search were drug ledgers or tally sheets. Specifically, Gonzalez asserts that such evidence at most related to other bad acts performed by the defendant and was too inherently prejudicial to allow for its admission into evidence at trial.
 
 
 19
 Testimony was offered that the evidence at issue was seized during a search of Gonzalez's home 16 days after the end of the conspiracies charged in the indictments in this case. Because the seizure occurred after the stated end of the conspiratorial actions, Gonzalez alleges that any such evidence was admitted only to establish subsequent misdeeds of the defendant in violation of the principles espoused in Rule 404(b) of the Federal Rules of Evidence. In support of her allegation, Gonzalez cites United States v. Zelinka, 862 F.2d 92 (6th Cir.1988), and United States v. Bakke, 942 F.2d 977 (6th Cir.1991).
 
 
 20
 Without question, Zelinka and Bakke stand for the proposition that evidence of subsequent crimes committed by a criminal defendant may not be admitted at trial unless those other bad acts are relevant to an issue actually raised in the proceedings. Zelinka, 862 F.2d at 98; Bakke, 942 F.2d at 982. What is equally clear, however, is that the district court in this case permitted introduction of the documentary evidence seized from Gonzalez's home not as evidence of other bad acts, but as evidence of the conspiracies charged in the indictments. In her final ruling on the admissibility of such evidence, the district judge concluded that the ledgers and tally sheets "appear to relate to the conspiracy. This is not other acts; this is evidence that I find is relevant...."
 
 
 21
 Such a conclusion appears correct in light of other evidence presented at trial. The sheets and calculations were seized only 16 days after the alleged termination of the conspiracies and were as likely to relate to drug transactions occurring during the pendency of the conspiracies as to anything else. In fact, both the government and Gonzalez note in their briefs on this issue that the evidence also contains notations for the months April, May, June, July, and August, although without reference to any particular year. Conversely, in Zelinka and Bakke, the district courts correctly determined that evidence gathered long after the termination of the charged conspiracies did not relate directly to the charged crimes and thus could be admitted only upon satisfaction of the requirements of Fed.R.Evid. 404(b).
 
 
 22
 In Zelinka, the indictment charged a conspiracy existing between March 19, 1985, and July 3, 1985. Zelinka was not arrested, however, until December 17, 1986, more than seventeen months after the alleged end of the conspiracy. Upon arresting Zelinka, authorities discovered one-half gram of cocaine in the defendant's possession and sought to tie that amount of contraband into the earlier conspiracy. In such a situation, this court properly concluded that any attempt to present evidence of the December 1986 possession to the jury must first pass muster under the constraints of Fed.R.Evid. 404(b) relating to evidence of other bad acts or crimes.
 
 
 23
 Similarly, in Bakke the government attempted to introduce evidence from an April 1988 arrest of the defendant as substantive evidence of the charged conspiracy that was alleged to have existed between December 1983 and October 1987. Again, presented with a factual situation involving evidence obtained six months after the termination of the conspiracy, we held that such evidence could not be considered part of the res gestae of the conspiracy and must instead satisfy the requirements of Rule 404(b) before being allowed into evidence.
 
 
 24
 Gonzalez also asserts that the documentary evidence in this case was improperly admitted at trial because the government failed to establish that Gonzalez prepared the documents, that no other individuals had access to her bedroom, or that the questioned evidence was even recovered from her residence. Contrary to the defendant's allegations, however, DEA agent Buckel did testify unequivocally that the seized documents were removed from the bedroom of Guadalupe Gonzalez. Any confusion regarding this matter resulted only from Buckel's statement that he had no written confirmation of the location from which the evidence was seized, not that the agent had any doubt that the documents were in fact recovered from a particular location. Furthermore, Gonzalez specifically told Buckel at the time of the search that the items in her bedroom belonged to her. Thus, the documentary evidence seized from Gonzalez's bedroom was sufficiently tied both to the defendant and to the charged conspiracies to present a jury question of whether the writings and calculations provided additional evidence of Gonzalez's guilt of the crimes for which she was tried.
 
 
 25
 Moreover, we conclude that even without introduction of the challenged evidence in this case, sufficient evidence was adduced at trial to justify a rational trier of fact in concluding that Gonzalez conspired as charged with the listed individuals to distribute both cocaine and marijuana. The evidence of Gonzalez's guilt was strong, and the testimony of witnesses at trial did more to connect Gonzalez with the conspiracies than did the sheets of calculations seized from her residence and introduced into evidence. Thus, even if the district court erred in admitting the challenged evidence, it is clear that the error did not affect the outcome of the case or affect substantial rights of the defendant and should be disregarded as harmless under Fed.R.Crim.P. 52(a).
 
 
 26
 II. Variance Between Indictment and Proof of Conspiracy
 
 
 27
 Defendant Salazar alleges that a variance existed between the crimes charged in the indictment and the proof offered at trial. In particular, Salazar contends that the evidence offered by the government failed to establish two large conspiracies encompassing all the individuals named in the indictment. Instead, argues Salazar, the proof at trial indicated only that a number of smaller conspiracies involving only a few individuals each were operating to distribute the cocaine and marijuana uncovered by the DEA.
 
 
 28
 This court has previously determined that "[i]f an indictment alleges one conspiracy, but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies, the resulting variance between the indictment and the proof is reversible error if the appellant can show that he was prejudiced thereby." United States v. Warner, 690 F.2d 545, 548 (6th Cir.1982). However, "a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." Id. at 549. Rather, because "the essence of the crime of conspiracy is agreement," in order to establish the existence of a single conspiracy, the government need only show "that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." Id. Moreover, as this Court stated in United States v. Milligan, 17 F.3d 177, 182-83 (6th Cir.1994):
 
 
 29
 Proof of a formal agreement is unnecessary, because acts done with a common purpose can establish an implicit agreement. A tacit or mutual understanding among conspirators is sufficient to show conspiratorial agreement, and conspiracy may be inferred from relevant and competent circumstantial evidence, such as acts of the conspirators themselves.
 
 
 30
 The question whether the proof at trial establishes a single conspiracy or multiple conspiracies "is usually a question of fact to be resolved by the jury under proper instructions and to be considered on appeal in the light most favorable to the government." United States v. Rios, 842 F.2d 868, 872 (6th Cir.1988) (per curiam), cert. denied, 488 U.S. 1031 (1989). See also United States v. Segines, 17 F.3d 847, 856 (6th Cir.1994). In this case, the government alleges that the indicted co-conspirators were linked in a "chain conspiracy." We recognized in Warner:
 
 
 31
 In ... a "chain" conspiracy, the agreement can be inferred from the interdependent nature of the criminal enterprise. Conspiracies to distribute narcotics, which normally involve numerous sales and resales of drugs until they reach the ultimate consumers, are often "chain" conspiracies. Because the success of participants on each level of distribution is dependent upon the existence of other levels of distribution, each member of the conspiracy must realize that he is participating in a joint enterprise, even if he does not know the identities of many of the participants.
 
 
 32
 Warner, 690 F.2d at 549 (citations omitted). See also Segines, 17 F.3d at 856. Salazar contends, however, that the evidence is insufficient to connect him with the sales of narcotics between Zapata and Jimenez and with the transfer of one kilo of cocaine between Garcia-Salinas and Perez-Castro.[2]
 
 
 33
 Contrary to Salazar's contention, the testimony of Michelle Jimenez does link the defendant directly to the sales of narcotics from Zapata to Jimenez. Jimenez stated that she purchased nine ounces of cocaine both in January 1992 and in February 1992 from Zapata and Salazar. The defendant, however, pinpoints certain portions of testimony in which Jimenez claims that Salazar did not personally give the cocaine to the witness. While "[m]ere presence is not enough to connect a person to a conspiracy," United States v. Braggs, 23 F.3d 1047, 1051 (6th Cir.1994), it is also clear that the fact that Salazar was not personally involved in every aspect of the cocaine distribution conspiracy does not exonerate him from liability for participation in the overall agreement. Bakke, 942 F.2d at 985. In this case, Salazar's involvement in the sale of cocaine to Jimenez is shown not only by his presence at the sale of the narcotic, but also by the testimony that the actual salesman on a particular date (Zapata) was Salazar's partner in the drug trade and by the testimony of the purchaser that Salazar was her supplier and that she owed money to Salazar for the fronted drugs.
 
 
 34
 There is also no merit to Salazar's contention that he was not shown to be involved in the Garcia-Salinas to Perez-Castro cocaine transaction involving one kilogram of the narcotic. Agent Buckel testified that he purchased the cocaine for $27,000 directly from Baltizar Garcia-Salinas and JoJo Cabrera. Jose Bolanos-Ramirez, in turn, testified that he delivered the drug to Cabrera and Garcia-Salinas on behalf of Perez-Castro. Bolanos-Ramirez also testified that he personally witnessed Lupe Gonzalez give the kilo of cocaine to Perez-Castro for further distribution. Because Garcia-Salinas and Cabrera were arrested upon the sale of the cocaine to Buckel, no payment for the transaction filtered its way back up the chain of organization. Then, in February or March 1992, Lupe Gonzalez, while speaking with Michelle Jimenez, bemoaned the fact that she owed Salazar $15,000 in payment for the kilo of cocaine that had been seized in the drug-bust by the DEA. Taken together and in the light most favorable to the government, this evidence is sufficient to allow a rational trier of fact to conclude that Salazar was involved in the December 9, 1991, sale of one kilo of cocaine to Agent Buckel.
 
 
 35
 In a final attempt to distance himself from the drug-distribution conspiracy, Salazar contends on appeal that his convictions rest upon the suspect testimony of witnesses who are themselves drug dealers or users and who have reached agreements with the government in exchange for their testimony. This court has, however, previously indicated:
 
 
 36
 [A]ny argument relating to the credibility of the government's witnesses and the inconsistencies in their testimony is irrelevant to our determination. The fact that the government's witnesses were testifying under plea agreements was made known to the jury. In light of this evidence, the jury found some of their testimony credible. Having so found, it is not our function as a reviewing court to reverse that determination.
 
 
 37
 Rios, 842 F.2d at 872. This issue is without merit.
 
 
 38
 III. Admission of Statements of Co-conspirators
 
 
 39
 Salazar and Gonzalez next contend that the district court erred in admitting into evidence "coconspirator hearsay statements" made in connection with the sale of the kilogram of cocaine to Agent Buckel on December 9, 1991. The defendants assert that such statements were inadmissible because the evidence at trial did not establish their participation in an allegedly separate conspiracy to sell cocaine to Buckel through Garcia-Salinas and Perez-Castro.
 
 
 40
 While statements made by co-conspirators are often admitted at trial under the "coconspirator exception" to the hearsay rule, such statements, when properly admitted, are actually non-hearsay, rather than exceptions to the rule barring admission of hearsay statements. As provided in Federal Rule of Evidence 801(d)(2)(E), "[a] statement is not hearsay if [t]he statement is offered against a party and is a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." In order to admit statements pursuant to Fed.R.Evid. 801(d)(2)(E), the district court must determine that the prosecution established "that: (1) a conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the statement was made in furtherance of the conspiracy." United States v. Clark, 18 F.3d 1337, 1341 (6th Cir.1994). The alleged hearsay statement of the coconspirator may even be considered in determining the existence of a conspiracy, Bourjaily v. United States, 483 U.S. 171, 178-80 (1987), as long as there is "some independent, corroborating evidence of defendant's knowledge of and participation in the conspiracy." Clark, 18 F.3d at 1341 (emphasis in original).
 
 
 41
 Before this court, the defendants claim that the evidence does not establish that they were members of the conspiracy responsible for the one kilogram sale of cocaine through Perez-Castro and Garcia-Salinas to Agent Buckel. We review the district court's factual determination on this matter for clear error. Id., citing United States v. Gessa, 971 F.2d 1257, 1261 (6th Cir.1992) (en banc). Based on our review, we conclude that the district court did not commit such error in this case. Not only did the "hearsay statement" of Lupe Gonzalez establish her and Salazar's participation in the conspiracy by indicating that Salazar originally provided the cocaine for the sale for approximately $15,000, an amount for which Gonzalez was still in debt to Salazar, but documentary evidence seized during a raid on the home of Salazar's business partner also suggested that Gonzalez did, in fact, owe Salazar and Zapata $15,500 for the drugs. This issue is also without merit.
 
 IV. Expert Witness Testimony
 
 42
 Salazar and Gonzalez next insist that the district court erred in permitting DEA Agent Fling to testify at trial both as a fact witness concerning cocaine sales and as an expert witness in the field of drug investigations. In this case, Fling offered "expert" testimony suggesting explanations for the figures and calculations found in notebooks seized from the homes of various co-conspirators, as well as testimony regarding drug prices at the time of the alleged conspiracy, and testimony explaining the structure of "chain" conspiracies. At trial, the only objection to Fling's expert testimony was an objection to the agent's expertise in the area of drug investigations. The district judge overruled the objection, however, in part because of Fling's 19 years of experience as a DEA agent and the expertise he had developed in the area of drug investigations over that period of time.
 
 
 43
 The defendants now contend, however, that the testimony offered by Fling as an expert was neither helpful nor needed to explain the relevance (or alleged irrelevance) of evidence to the "sophisticated" jurors of southeast Michigan. The defendants also insist that allowing Fling to testify as an expert impermissibly bolstered his factual testimony before the jury. Because the defendants did not raise before the district court the specific objections now advanced on appeal, we examine these new allegations of error only for plain error. United States v. Evans, 883 F.2d 496, 499 (6th Cir.1989).
 
 
 44
 Rule 702 of the Federal Rules of Evidence specifically provides for admission of expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...." Even one of the cases upon which the defendants rely to support their position on this issue, United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir.1991), recognizes that the Second Circuit has "repeatedly affirmed that the operations of narcotics dealers are a proper subject for expert testimony under Fed.R.Evid. 702...." The Castillo opinion cautions, however, that the subject matter of the expert testimony must be "beyond the ken of the average juror." Id. While the "expert" testimony proffered in Castillo (use of scales in drug operations, use of abandoned apartments for drug headquarters, use of firearms by drug dealers), was properly determined on appeal to be within the knowledge of a typical juror, the information presented in this case by Fling would not be as readily apparent to the average juror.
 
 
 45
 Furthermore, acceptance of Fling as an expert in drug investigations did not prejudice the defendants by improperly bolstering the agent's testimony regarding his drug buys from a member of the charged conspiracy. All aspects of those drug buys were corroborated by the testimony of Noel Cintron himself. Consequently, the district court did not commit plain error in determining that Fling could offer his expert testimony to the jury in the area of drug investigation.
 
 V. Sentencing Issues
 A. Calculation of Drug Amount
 
 46
 In his first challenge to the sentence imposed upon him, Salazar contends that the district court improperly calculated the amount of marijuana equivalent attributable to him for sentencing purposes. Specifically, Salazar argues that the evidence before the court was not sufficient to connect him with the December 9, 1991, sale of one kilogram of cocaine to Agent Buckel, the August 21, 1991, sale of four and one-half ounces of cocaine to Agent Buckel, or March 2, 1991, and April 25, 1991, sales of a total of one and one-quarter ounces of cocaine to Agent Fling. He thus insists that his base offense level should have been reduced from Level 28 to Level 26 after eliminating consideration of the 1161 grams of cocaine (or 232.2 kilograms of marijuana equivalent) involved in the questioned sales.
 
 
 47
 As we stated in United States v. Obiukwu, 17 F.3d 816, 821-22 (6th Cir.1994) (per curiam):
 
 
 48
 Under U.S.S.G. Sec. 1B1.3, ... a conspirator is not automatically charged with responsibility for all the narcotics funnelled through the conspiracy; quantities handled by other conspirators are attributed to a defendant only if the conduct of the other conspirators was "reasonably foreseeable" to the defendant and was within the scope of the criminal activity the defendant agreed jointly to undertake.
 
 
 49
 In reviewing factual determinations made in a sentencing hearing on such an issue, this court will not reverse the decision of a district court unless it is clearly erroneous. United States v. Wright, 12 F.3d 70, 72 (6th Cir.1993).
 
 
 50
 Salazar is sufficiently tied to the December 9 drug transaction by evidence adduced at trial. According to that evidence, Buckel purchased one kilo of cocaine from Garcia-Salinas and Cabrera. Jose Bolanos-Ramirez testified that he personally delivered the kilo to the final sellers after receiving the drugs from Perez-Castro. Bolanos-Ramirez also stated that he heard Perez-Castro ask Lupe Gonzalez for the kilo and observed him receive a package from Gonzalez before Perez-Castro handed the item to Bolanos-Ramirez for delivery. Finally, a few months after the drug sale and the resulting arrests and confiscation of the purchase money, Gonzalez was heard bemoaning the fact that she owed Salazar $15,000 for the narcotics taken in the drug bust. Documentary evidence introduced at the trial corroborated the fact that Gonzalez owed $15,500 to Salazar and Zapata. Based upon this evidence, the district court properly concluded that the sale of the one kilo of cocaine to Buckel was one of the "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. Sec. 1B1.3(a)(1)(B). Consequently, the marijuana equivalent of that cocaine should be counted against Salazar in calculating his base offense level for the crimes for which he was convicted.
 
 
 51
 Salazar also contends that the cocaine amounts involved in sales between Noel Cintron and Agent Fling and between Ramone Salinas and Agent Buckel should not be added to other relevant drug amounts in computing the defendant's sentence. In calculating the total amount of marijuana equivalent for which Salazar could be held accountable, the district court considered only some of the alleged drug sales in furtherance of the charged conspiracies. Specifically, the district court eliminated from consideration all but two Cintron/Fling transactions and one Salinas/Buckel transaction in computing the drug amounts purchased by those DEA agents. Whether those sales are added into the equation is, however, irrelevant. The total amount of the March 2 and April 25 sales to Agent Fling was only one and one-quarter ounces, or 35 grams, of cocaine (or seven kilograms of marijuana equivalent). The total amount of the August 21 sale to Agent Buckel was four and one-half ounces, or 126 grams, of cocaine (or 25.2 kilograms of marijuana equivalent). Added together, those amounts would reduce the quantity of marijuana equivalent for which Salazar was responsible only to 429.1 kilograms and would not, therefore, alter the base offense level assigned to Salazar. See U.S.S.G. Sec. 2D1.1(c)(8). Thus, even if the district court erred in including the drug amounts from these challenged sales in the computation of the total amount of narcotics attributable to Salazar, substantial rights of the defendant were not affected. Consequently, any such error was clearly harmless. Fed.R.Crim.P. 52(a).
 
 
 52
 VI. Sentence Enhancement for Supervisory Role
 
 
 53
 In a final contention of error, Salazar asserts that the district court erred in increasing his base offense level from 28 to 30 because of the defendant's alleged leadership or organizational role in the criminal activity. Salazar argues again that the evidence at trial failed to show he had any connection whatsoever with Noel Cintron or with Baltizar Garcia-Salinas. Salazar also correctly notes that more than a mere buyer-seller relationship is required to support a finding that a defendant exercised a leadership or supervisory role in an offense; he mistakenly insists, however, that his relationship with the co-conspirators was only such a buyer-seller relationship.
 
 
 54
 Section 3B1.1 of the Sentencing Guidelines provides:
 
 
 55
 Based on the defendant's role in the offense, increase the offense level as follows:
 
 
 56
 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
 
 
 57
 (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
 
 
 58
 (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.
 
 
 59
 The determination of whether a criminal defendant is an organizer, leader, manager, or supervisor of criminal activity "is a factual one, which, upon appellate review, is subject to the clearly erroneous standard." United States v. Schultz, 14 F.3d 1093, 1099 (6th Cir.1994) quoting, United States v. Williams, 894 F.2d 208, 213-14 (6th Cir.1990).
 
 
 60
 The district judge in this case concluded at the sentencing hearing that Salazar "supervised Cintron, Gonzalez, Jimenez, Parrilla, and Salinas." The court further noted:
 
 
 61
 Well, there were two people who worked with him according to the testimony--and I was here during this trial, I didn't just read the transcript--two people worked with him in the packaging and distribution; and the others, of course, were on consignment selling, according to the testimony. So that is resolved. The Court finds that he is a supervisor.
 
 
 62
 That decision by the district judge is not clearly erroneous. The evidence before the court established that Salazar supplied narcotics to numerous individuals with the expectation that those drugs would be sold to others and that the receipts from the sales would be paid to him. Moreover, even though payments were due to him, the network of co-conspirators was designed so that street-level sellers knew their payments to Salazar for fronted drugs could be made to other individuals without involving Salazar in the mundane aspects of the distribution operation. Establishment of such an organizational structure and division of labor can provide sufficient evidence to support the conclusion that Salazar was an organizer, leader, manager, or supervisor of the criminal activity involved in these conspiracies. See Schultz, 14 F.3d at 1099 ("[o]rganizing and coordinating [a] ... scheme of distribution that brings contraband into a community for distribution on a continuing basis" is sufficient to support a finding that the defendant is an "organizer" of criminal activity); United States v. Brown, 946 F.2d 1191, 1197 (6th Cir.1991) (enhancement for leadership role in offense is proper if defendant is clearly the dominant figure "running the deal").
 
 
 63
 We note that the judgment in Salazar's case, while correctly defining the applicable sentencing range as 108 to 135 months, incorrectly designates Salazar as an offense level 34, criminal history category I offender. In fact, Salazar was appropriately sentenced by the district judge based upon an offense level of 30 and a criminal history category of II. The length of the sentence imposed by the district court is not affected by this error, however.
 
 
 64
 We conclude that there is no merit to any of the issues raised in this appeal by Gonzalez or by Salazar. The convictions and sentences of the defendants are, therefore, AFFIRMED. Because of the improper offense level and criminal history category designations in the district court's judgment of Salazar, his case is REMANDED to the district court for correction of that judgment form.
 
 
 
 [1]
 Furthermore, on July 1, 1992, when Zapata's home was searched, three bags of marijuana were also seized from underneath a bed in the residence
 
 
 [2]
 Although Salazar's brief contests his connection in the "separate conspiracy between Ramone Salinas and a person named Perez Castro to sell cocaine," the questioned transaction was in fact between Baltizar Garcia-Salinas and Perez-Castro. Ramone Salinas was not involved in the one kilogram sale of cocaine to DEA agent Buckel on December 9, 1991