UNITED STATES of America, Appellee,

v.

Juan Antonio TAPIA–ORTIZ and Ernesto Velez–Morales, Defendants–Appellants.

Nos. 757, 332, Dockets 92–1435, 93–1322.

United States Court of Appeals, Second Circuit.

Argued Dec. 13, 1993.

Decided May 9, 1994.

Barry E. Schulman, Schulman & Laifer, Esqs., Brooklyn, NY, for defendant-appellant Tapia–Ortiz.

Richard Ware Levitt, New York City, for defendant-appellant Velez–Morales.

Bridget M. Rohde, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty. for the E.D. of N.Y., David C. James, Asst. U.S. Atty., Brooklyn, NY, of counsel), for appellee.

Before: MINER and WALKER, Circuit Judges, and MUNSON, District Judge.*

WALKER, Circuit Judge:

Defendants Juan Tapia–Ortiz and Ernesto Velez–Morales appeal from judgments entered in the United States District Court for the Eastern District of New York (Thomas C. Platt, Jr., *Chief Judge*), convicting them after a jury trial of conspiring to distribute heroin and cocaine in violation of 21 U.S.C. § 846, and of possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Defendants argue that their convictions should be reversed because the Government improperly bolstered its case by introducing expert testimony regarding the habits of narcotics traffickers. Tapia–Ortiz also contends that his sentence was erroneously determined based in part on his alleged participation in an uncharged but related heroin transaction. We reject defendants' argument regarding the expert testimony and affirm the convictions but vacate Tapia–Ortiz's sentence and remand for further proceedings.

## BACKGROUND

The evidence at trial, presented through two informants and several law enforcement officers, demonstrated that from November 1990 to September 1991, both defendants were involved in a conspiracy to distribute heroin and cocaine.

The defendants' involvement in the heroin trade was established by an informant, Hector Hernandez, who testified that on ten to fifteen occasions in 1990 and 1991 he bought heroin from the defendants at one or another of two bars in Brooklyn, one of which was owned by Tapia–Ortiz. Beginning in March 1991, Hernandez recorded his purchases in a composition book in which he kept track of his narcotics transactions. Hernandez testified that he contacted Tapia–Ortiz, whom he knew as "Flaco," by using an agreed-upon beeper system. After beeping Tapia–Ortiz, Hernandez would enter a special code number after his telephone number so that Tapia–Ortiz would know who was calling. When Velez–Morales was arrested, he had on his person a business card from one of the bars with Hernandez's beeper number and code number written on it.

Defendants' cocaine trafficking was established by several law enforcement officers and an informant named Aldimor Isaziga Romero. Working with undercover agents, Isaziga negotiated with Tapia–Ortiz, also known to him as "Flaco," for the sale to defendants of approximately twenty kilograms of cocaine for $260,000, with $100,000 due in advance. In August 1991, Isaziga received the advance monies: $22,000 from an associate of defendants and $78,000 directly from Tapia–Ortiz. Both payments took place in Florida and were in cash. Several days later in New York, Isaziga and an undercover agent brought the cocaine in the trunk of a car to the parking lot of a hotel on Long Island and met the defendants in the hotel. The agent escorted Velez–Morales to the car, opened the trunk to show him the twenty kilograms of cocaine, gave him the car keys, and allowed him to drive away. After leading officers on a high-speed car chase, Velez–Morales was apprehended. Tapia–Ortiz was arrested in his car shortly after leaving the hotel. At the time, he was in possession of a beeper and business cards with contact numbers written on them.

In addition to the eyewitness testimony as to these events, the Government introduced

---

* Honorable Howard G. Munson, Senior District Judge, United States District Court for the North- ern District of New York, sitting by designation.

expert testimony on narcotics trafficking through Special Agent James Glauner of the Drug Enforcement Administration. Over defense objection, Agent Glauner testified about the amount and purity of the cocaine possessed by defendants; the dosages it would yield and their street value; the ways in which narcotics trafficters conceal their activities by using false names, cash, and beepers; and the practice of using a beeper code so that the receiver will know who is calling. Glauner also concluded after reviewing Hernandez's composition book that it was an accounting record of heroin transactions.

The jury found defendants guilty of conspiring to distribute heroin and cocaine and of possessing cocaine with the intent to distribute it. Tapia–Ortiz received a prison term of 480 months and five years supervised release and was given a $100,000 fine and a $100 special assessment. Velez–Morales was sentenced to prison for 210 months, to be followed by five years supervised release, and was given a $100 special assessment. Both sentences were imposed under the Sentencing Guidelines.

Tapia–Ortiz's greater sentence was based in substantial part upon a determination of his base offense level that, in addition to the offenses for which he was convicted, included his alleged participation in planning an uncharged but related heroin transaction. The inclusion of the heroin transaction was based upon testimony provided by Special Agent Allan Payne of the United States Customs Service at a *Fatico* hearing that Isaziga had told Payne that the cocaine deal was simply a "test run" for a 60 to 100 kilogram heroin deal and that Tapia–Ortiz was supposed to serve as the buyer of both the cocaine and the heroin.

## DISCUSSION

### I. The Use of Expert Testimony

■ The decision to admit expert testimony under Rule 702 of the Federal Rules of Evidence is left to the "broad discretion" of the district court and will be sustained unless "manifestly erroneous." *United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). Defendants contend that the trial court committed such manifest error in admitting the expert testimony of Agent Glauner because the subject matter of his testimony was not beyond the ken of the jury. Defendants rely primarily on *United States v. Cruz*, 981 F.2d 659 (2d Cir.1992), and *United States v. Castillo*, 924 F.2d 1227 (2d Cir.1991). In both cases, we reversed the defendants' convictions because the Government improperly used expert testimony on the drug trafficking trade.

In *Cruz*, we held "that expert testimony cannot be used solely to bolster the credibility of the government's fact-witnesses by mirroring their version of events." 981 F.2d at 664. In that case, a law enforcement official gave expert testimony about the conduct of brokers who arrange drug transactions between purchasers in Albany and suppliers in the Washington Heights area of Manhattan which corresponded closely to earlier factual accounts of the defendant's alleged activities. In *Castillo*, a detective testified about typical operating methods of Washington Heights drug dealers, describing their work apartments, the drug-related materials typically found within these apartments, and the practice of making potential customers snort cocaine. We held that the admission of this expert testimony was erroneous because the jury was capable of understanding these matters without the expert's assistance. 924 F.2d at 1233. In both cases, the Government relied heavily on the expert testimony during summation, stressing the similarities between the witnesses' version of events and the expert's description of typical drug transactions. While reaffirming our position "that the operations of narcotics dealers are a proper subject for expert testimony," we cautioned that such testimony should normally be used only for subjects that have esoteric aspects reasonably perceived as beyond the ken of the jury. *Cruz*, 981 F.2d at 664; *Castillo*, 924 F.2d at 1232.

This case is different from the situations presented in *Cruz* and *Castillo*. Agent Glauner did not give a narrative statement of a typical drug transaction that mirrored the testimony of the Government's fact-witnesses. On the contrary, he provided brief, crisp

answers to the Government's questions about several discrete topics: the· purity and the weight of the cocaine seized from the defendants, the dosages this cocaine would yield for resale on the street, the wholesale price of the cocaine, the use of beepers by narcotics traffickers, the technique of using codes with beepers to signal the identity of the caller, and the use of cash and nicknames or false names by drug traffickers. In addition, Agent Glauner opined that Hernandez's composition book was an accounting record of drug sales. His substantive testimony constituted only five pages of a trial transcript that spanned 486 pages.

■■■ While some of the subjects about which Agent Glauner testified are more esoteric than others, his statements fell within the bounds of acceptable use of expert testimony. Testimony about the weight, purity, dosages, and prices of cocaine clearly relates to knowledge beyond the ken of the average juror. Our circuit has also previously permitted expert testimony regarding the use of beepers and code numbers by narcotics traffickers, *United States v. Ginsberg*, 758 F.2d 823, 830 (2d Cir.1985), and the accounting books they keep in connection with narcotics transactions, *United States v. Diaz*, 878 F.2d 608, 616–18 (2d Cir.), *cert. denied*, 493 U.S. 993, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989). Agent Glauner's information about the purity, weight, and value of the cocaine was relevant to proving that the drugs in this case were intended for distribution, and his testimony about the use of beepers and the accounting book was helpful in understanding the business cards found in defendants' possession and Hernandez's composition book. The admission of Agent Glauner's testimony on these subjects was therefore not manifestly erroneous.

■■■ We recognize that the Agent's testimony regarding traffickers' use of cash and nicknames in order to conceal their identities has a common sense aspect to it that makes its admission more troubling. However, as we indicated in *Cruz*, expert testimony may be used "on some occasions to explain even non-esoteric matters, when the defense seeks to discredit the government's version of events as improbable criminal behavior."

981 F.2d at 664. Counsel for both defendants asserted such a defense.

Counsel for Tapia–Ortiz acknowledged that Tapia–Ortiz had conversations with Isaziga, appeared at the meeting at the Long Island hotel where the cocaine was delivered, and possessed business cards with phone numbers written on the back when arrested, but argued that his conduct could not have been criminal because the agents allowed him to leave the Long Island hotel without arresting him. Counsel for Velez–Morales similarly asserted that his activities were not related to narcotics. He argued that Velez–Morales's possession of a business card with Hernandez's beeper number and code number was meaningless because there was no evidence that he possessed a beeper; that although Velez–Morales wired money to Tapia–Ortiz in Florida prior to the latter's delivery of money to Isaziga, evidence of this transaction was simply an attempt to create guilt by association; that there was no way for Velez–Morales to know that there were drugs in the trunk of the car he drove away from the Long Island hotel; and that the ensuing high-speed chase occurred because anyone in those circumstances could "panic."

Because both defendants argued that the Government's version of events did not suggest · criminal activity, the Government was justified in introducing expert testimony explaining that drug traffickers employ certain techniques, such as using beepers, cash, and nicknames, in order to avoid detection. *See United States v. Brown*, 776 F.2d 397, 400–02 (2d Cir.1985) (police officer permitted to describe typical drug buy in Harlem, including the role of a steerer, where the accused's defense was that he was on the scene but unaware of any drug transaction), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986).

Our conclusion that no error occurred in this case is supported by the fact that the Government did not place great emphasis on Agent Glauner's testimony in its summation. While the prosecutor incorporated information about the weight and dosages of the seized cocaine into his remarks, he explicitly referred to Agent Glauner only once. In the context of discussing Hernandez's accounting

book, which contained multiple references to "Flaco," the prosecutor reminded the jury that Agent Glauner "told you that drug dealers use nicknames." He also stated that because drug-dealing is an illegal business, traffickers will "pay in cash" and "use beepers" in order to avoid detection. These statements reflect the total use of Agent Glauner's testimony during summation.

Unlike in *Cruz* and *Castillo,* the prosecutor did not stress the similarities between the testimony of its fact-witnesses and an expert's description of a typical drug transaction. As such, this case simply does not present the problem of the Government impermissibly using expert testimony to bolster the credibility of its fact-witnesses by mirroring their version of events. In addition, although testimony properly admitted under Rule 702 can still be excluded under Rule 403 on the basis that its probative value is outweighed by its prejudicial effect, we do not believe that the district court abused its discretion in determining that the usefulness of Agent Glauner's testimony was not outweighed by a danger of unfair prejudice. *See United States v. Roldan–Zapata,* 916 F.2d 795, 805 (2d Cir.1990), *cert. denied,* 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991).

Accordingly, we deny both defendants' claims that their convictions should be vacated based on the admission of Agent Glauner's testimony. However, we caution the Government that expert testimony regarding the more elementary concepts of detection avoidance will in many instances be unnecessary and in different circumstances could lead to a finding of reversible error.

## II. *Tapia–Ortiz's Sentence Enhancement*

■ Tapia–Ortiz claims that his sentence should be vacated because there was insufficient evidence to support the district court's finding that he was involved in a related drug transaction for 60 to 100 kilograms of heroin. The district court's factual findings are reviewed under a clearly erroneous standard. *United States v. Burnett,* 968 F.2d 278, 280 (2d Cir.1992).

The district court based its findings on the testimony provided by Agent Payne at a

*Fatico* hearing. Agent Payne indicated that Isaziga had informed him during debriefing sessions that prior to any negotiations with Tapia–Ortiz, Isaziga had met with an individual named "Cedeno" in Colombia. Isaziga and Cedeno allegedly agreed that the cocaine deal would serve as a "test run" for a larger deal involving between 60 and 100 kilograms of heroin. Cedeno apparently told Isaziga to contact Tapia–Ortiz when Isaziga returned to the United States, and that Tapia–Ortiz would serve as the contact person for both transactions. However, on the critical question of whether Isaziga had subsequently discussed the future heroin transaction with Tapia–Ortiz, Agent Payne's testimony was conflicted and ultimately inconclusive.

On direct examination, Agent Payne testified as follows:

Q: What else was discussed down in South America about the—there was discussion about the cocaine. Was there any discussion about a heroin deal?

A: As the subsequent—if the 20 kilos had gotten through and there were no problems, as far as Mr. Tapia was concerned, then there was suppose [sic] to be another deal in the future. The amount was not exactly known, but it was suppose [sic] to be somewhere between 60 and 100 kilos, as told to me by Mr. Isaziga.

Q: Was it going to work the same way where the ultimate recipient would be the defendant in New York?

A: Yes.

Q: And was that also discussed? That was discussed in South America?

A: Yes.

Agent Payne's direct examination provided no further information regarding whether Tapia–Ortiz knew about the negotiations between Isaziga and Cedeno in South America or that he was to play a role in a future heroin transaction.

During cross-examination, Agent Payne's testimony regarding Tapia–Ortiz's knowledge of the heroin deal was contradictory. The pertinent testimony reads:

Q: So there was no discussion about Mr. Tapia's role between Cedeno and Isaziga?

A: Other than the fact that he was to give the drugs to Mr. Tapia.

Q: Did Mr. Isaziga ever say he sat down and talked with Mr. Tapia Ortiz about 60 to 100 kilos?

A: No, he did not.

Q: Did he ever ask him to confirm whether that was true or not in any way? Did they talk about further deals, to the best of your knowledge?

A: Yes, they did.

Q: Further heroin deals?

A: Just—no, just that one heroin deal after the cocaine deal.

At best, this testimony contains inconsistent statements that provide scant support for the Government's position. First Agent Payne responded that Isaziga never said he talked with Tapia–Ortiz about the deal involving 60 to 100 kilograms of heroin. Then he said that "they" talked about the "one heroin deal after the cocaine deal." The first statement flatly exculpated Tapia–Ortiz with respect to knowledge of the "heroin deal." The second statement is ambiguous depending on who the word "they" refers to. If the reference is to Isaziga and Cedeno, then Tapia–Ortiz is not implicated. If the reference is to Isaziga and Tapia–Ortiz, then the second statement cannot be reconciled with the first. Thus, we do not see how this testimony can be taken to mean that Isaziga definitely discussed the heroin deal with Tapia–Ortiz. Agent Payne subsequently admitted that at no time did he attempt to have Isaziga record Tapia–Ortiz talking about heroin and that the agent who listened to recorded conversations between Isaziga and Tapia–Ortiz never heard them talk about a heroin deal.

The Government argues that it is at least a reasonable inference from this evidence that Tapia–Ortiz was aware that the cocaine deal was simply a dry run for a larger heroin deal in which he was also to be the recipient. However, this argument simply requires too great a leap from the actual evidence presented. Even if Isaziga and Cedeno both believed Tapia–Ortiz would serve as the contact person for a future heroin transaction, and even if he would have been willing to do this if asked, the Government failed to show by a preponderance of the evidence that he knew of the transaction and agreed to participate in it.

The district court imputed knowledge to Tapia–Ortiz based on the statement of Cedeno, his alleged co-conspirator, that Tapia–Ortiz would serve as the buyer in both transactions. Yet even if we assume *arguendo* that Tapia–Ortiz was involved in an uncharged conspiracy with Cedeno, the Government must show that the actions of Cedeno were in furtherance of the conspiracy and were reasonably foreseeable to Tapia–Ortiz before Tapia–Ortiz can be held responsible for them. *See United States v. Miranda–Ortiz*, 926 F.2d 172, 177–78 (2d Cir.) (co-conspirator cannot be sentenced for certain conspiratorial acts unless there is proof that he knew or should have known about the details of those acts or could reasonably foresee that they would occur), *cert. denied*, —— U.S. ——, 112 S.Ct. 347, 116 L.Ed.2d 287 (1991); *see also United States v. Martinez*, 987 F.2d 920, 926 (2d Cir.1993) (conspirator's reasonable knowledge of relevant conduct is required by statute imposing mandatory minimum sentences for certain drug offenses). The Government has failed to meet this burden. Its argument that Tapia–Ortiz must have known of the future heroin deal because of his participation in the cocaine deal, without any further showing regarding the scope of Tapia–Ortiz's agreement with Cedeno, is simply untenable. Given the lack of evidence presented regarding Tapia–Ortiz's knowledge of the prospective heroin deal, we conclude that it was clearly erroneous for the district court to find that he was involved in this transaction, and therefore error to calculate his base offense level by including this conduct.

We have carefully considered the other points raised by defendants and find them to be without merit. For the reasons set forth above, we affirm the judgments of conviction but vacate Tapia–Ortiz's sentence and remand for further proceedings consistent with this opinion.