USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-2209

 UNITED STATES,

 Appellee,

 v.

 CORWIN GAINES,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. George A. O'Toole, Jr., U.S. District Judge]

 Before

 Lipez, Circuit Judge,
 
 Coffin and Campbell, Senior Circuit Judges.
 
 

 Kimberly Homan with whom Sheketoff & Homan was on brief for
appellant.
 Michael D. Ricciuti, Assistant United States Attorney, with
whom Donald K. Stern, United States Attorney, Kimberly S. Budd and
Dina Michael Chaitowitz, Assistant United States Attorneys, were on
brief for appellee.

March 10, 1999

 
 

 CAMPBELL, Senior Circuit Judge. Corwin Gaines appeals
from his conviction in the district court on two counts of
possession of crack cocaine with intent to distribute and on one
count of conspiracy to possess crack cocaine with intent to
distribute. Gaines claims that the district court made several
erroneous evidentiary rulings and improperly permitted the
prosecutor to employ a prohibited cross-examination technique. We
affirm.

 I.
 We recite facts the jury reasonably could have found,
viewing the evidence in the light most favorable to the verdicts. 
See, e.g., United States v. Josleyn, 99 F.3d 1182, 1185 n.1 (1stCir. 1996).
 In the Spring of 1996, the U.S. Drug Enforcement Agency
and Boston Police Department began a joint investigation into the
distribution of crack cocaine from an apartment at 27 Lambert
Avenue in the Roxbury section of Boston. The police had received
several complaints that strangers were repeatedly arriving at the
Lambert address, entering the apartment building, and then leaving
two or three minutes later. Suspecting possible drug activity, the
law enforcement officials began surveillance at 27 Lambert and
employed a confidential informant ("the CI"), operating under the
codename "Bugsy", to attempt to make controlled purchases of crack
cocaine.
 The surveillance revealed that Allen Franklin, a/k/a
"Chico", was heading a crack cocaine distribution from two
apartments in Roxbury, one at 27 Lambert Avenue and one at 34
Fisher Avenue. Franklin was assisted by several family members and
friends, including his half-brother Dana Franklin, his grandmother,
Geneva Franklin, and his cousin Larry "Little Bit" Eason. The
Fisher address, where Allen Franklin resided, was used for
preparing and bagging the crack cocaine into portions known as
"dimes" (one-tenth of a gram) or "50 rocks" (one gram). The
apartment at 27 Lambert Avenue, which was the home of Geneva
Franklin, operated as the distribution network center. 
 Allen Franklin, Dana Franklin, and Dana Franklin's
girlfriend, Amy Hatch, all testified for the prosecution. They
asserted that Gaines was Allen Franklin's main supplier of crack
cocaine. Allen Franklin testified that he would visit Gaines to
purchase drugs approximately every three to four days, often buying
them "on consignment" for later payment in cash. When Franklin
wanted drugs, he stated that he would page Gaines. Gaines would
then call him back and invite him to his apartment, which was
located in a three-story apartment building at 78 Brookley Road in
the Jamaica Plain section of Boston. Franklin would ring the
doorbell at the entrance of the apartment building and wait for
Gaines to drop a key down from the third-story outdoor porch. He
would then get the crack cocaine from Gaines and return either to
his own apartment at Fisher Avenue to prepare the drugs for sale,
or directly to Geneva Franklin's apartment at Lambert Avenue, where
a customer would be waiting. On the rare occasions when Gaines did
not have any crack cocaine for him, Franklin said that he would go
to an alternate supplier. 
 Allen Franklin's dealings with Gaines were corroborated
by testimony of police officers who had conducted surveillance of
the CI's purchases at the Lambert address. They observed the CI,
wearing a hidden recording device, arrive at the Lambert address
and request crack cocaine. Soon after, they saw Allen Franklin
leave the apartment and drive to Gaines's apartment. Franklin was
unaware that he was being followed by the police. The officers who
conducted the surveillance confirmed that Gaines would drop a key
to let Franklin in the building, and that after leaving the
Brookley address, Franklin would return directly to Geneva
Franklin's apartment or stop off at the Fisher address. On several
occasions, Franklin made an additional stop at an undisclosed
location, which the police surmised was the site of Franklin's
alternate crack cocaine supplier. 
 According to Dana Franklin, who occasionally accompanied
his half-brother to Gaines's apartment, Gaines would sometimes
bring the crack cocaine directly to Allen Franklin's apartment at
Fisher Avenue. Both Dana Franklin and Allen Franklin testified
that the latter had fallen behind in his payments to Gaines, and
Dana recalled once seeing Allen on his way to Gaines's apartment
holding a shoe box and saying, "This will get us ahead." Dana took
this to mean that the shoe box was full of cash and that they could
finally repay their debt to Gaines.
 On July 12, 1996, a federal search warrant was executed
at Gaines's apartment. Massachusetts State Police Trooper Paul
Hartley lead a team of approximately six searching agents, who
entered after both Gaines and his live-in girlfriend, Tara Ramos,
had left the building. The agents found crack cocaine in several
places in the apartment. The largest find was on the back outside
porch. Inside a green trash bag, they found a ziplock bag
containing 6.2 pounds of crack cocaine. In the dining room, the
police discovered a black duffel bag with more ziplock bags full of
crack cocaine. Also in the dining room was a black backpack
containing a digital scale that measured weights as little as one-
hundredth of a gram, and a Nike shoe box containing $587 in small
denomination bills. On the highest shelf of the kitchen pantry,
the officers found eight grams of crack cocaine in three separate
bags. In a portable closet in the dining room, they found a Nike
shoe box containing $7,000 cash in one-hundred dollar bills. 
 As the search was coming to a close, Gaines and Ramos
arrived outside the apartment building. They were immediately
detained and Gaines was informed that there was a federal warrant
for his arrest. He was ultimately charged in an eight-count
indictment naming him, Allen Franklin, and a man who had been
living with Franklin at the Fisher address, Frank Turner. Franklin
pled guilty to all counts and testified as one of the prosecution's
chief witnesses against Gaines. After his first trial ended in a
mistrial, Gaines was re-tried and convicted on three counts -- two
counts of possession of cocaine base with intent to distribute, in
violation of 21 U.S.C. 841(a)(1), and one count of conspiring
with Franklin and Turner to possess cocaine base with intent to
distribute, in violation of 21 U.S.C. 846. This appeal followed. 

 II.
 A. Allen Franklin's Testimony Regarding Geneva
 Franklin's Tape-recorded Statements

 Gaines assigns error to testimony that concerned the CI's
controlled purchase of crack cocaine from Allen Franklin on May 21,
1996. On that day, the CI arrived at 21 Lambert Avenue and spoke
with Geneva Franklin until Allen Franklin arrived with crack
cocaine. The conversation was tape recorded by the CI. The
transcript of that tape recording, which the parties stipulated
could be used as an exhibit to clarify the tape recording itself,
reads in pertinent part:
G. Franklin: Who is it?
CI: Bugs, Mama.
G. Franklin: Hey, Bugs.
CI: Hey, girl.
G. Franklin: Nobody's here, but they told me what to tell you
 when you come.
CI: Okay.
G. Franklin: I gotta go, uh, call the house.

 . . . 

CI: How you doing?
G. Franklin: I called the house.
CI: Uh huh.
G. Franklin: And uh Lisa said Chico and Frankie and Dawn had
 gone to meet the guy to get the stuff.

 . . . 

G. Franklin: I don't know what's happening Bugs. Half the
 customers stopped coming here. I don't know why
 cause--
CI: Maybe the quality of, the quality of the stuff
 he's been havin' lately ain't all, ain't, ain't
 up to, to par, not what Chico usually has.
G. Franklin: Ain't what he usually has.
CI: No.
G. Franklin: 'Cause he usually has the best.
CI: Yep.
G. Franklin: But now, uh, uh, uh, he can't get the best stuff
 'cause he ain't got that money the man want
 (unintelligible) get something else fast to get
 that man with the good stuff the money, you know.
CI: Uh huh. That's right.

 . . . 

G. Franklin: Yeah. The man called, Mr. Corwin Gaines, the
 other day. We'll definitely get you stuff,
 'cause this might be good.
CI: Wow.
G. Franklin: (unintelligible) But the man don't get nothing
 but the good stuff.

 After this excerpt was played for the jury, the
prosecutor had the following exchange with Allen Franklin:
Q: Did you recognize the voices on the excerpted
 tape?
A: Yes, I do.
Q: Who is speaking?
A: My mother, Geneva Franklin, and Bugsy.
Q: When Geneva Franklin mentions Mr. Corwin Gaines,
 what is she referring to?
Defense: Objection.
The Court: Overruled.
A: She's referring to me going to his house to go
 pick up the crack.
Q: And what is she referring to when she says the
 man wants the money?
A: She was - what she was referring to by that was
 I already owed him some money so I had to go over
 there and pay him that money.
Q: And who was that?
A: Corwin.

 Gaines contends that the district court committed
reversible error in permitting Allen Franklin to express his
opinion on what Geneva Franklin was referring to when mentioning
Mr. Corwin Gaines and saying "the man wants money." Being a lay
witness, not an expert, Allen Franklin could give his opinion only
if it was rationally based on his perception and was helpful either
to an understanding of his testimony or the determination of a fact
in issue. Fed. R. Evid. 701; United States v. Saccoccia, 58 F.3d
754, 780 (1st Cir. 1995), cert. denied, 577 U.S. 1105 (1996). A
strong case can be made that Allen Franklin's challenged testimony
was rationally based on his perception: he recognized his
grandmother Geneva's taped voice; she stated in the tape that he
("Chico") had gone with Frankie and Dawn "to meet the guy to get
the stuff." From this and other parts of his own and the taped
testimony, it was clear he was taking part at the time of the taped
conversation in the events Geneva was describing. Extensive other
evidence further indicated that Geneva and Allen Franklin were co-
conspirators who worked closely together. The judge could
conclude, therefore, that Allen was uniquely able, on the basis of
his first-hand perception, to explain the particular references
that day by Geneva, both of which, in fact, related to him. See,
e.g., United States v. Garcia, 994 F.2d 1499, 1505-06 (10th Cir.
1993); United States v. Simas, 937 F.2d 459, 464-65 (9th Cir. 1991). 
Federal courts have often allowed lay witnesses with similar inside
knowledge to give their opinions as to the meanings of "code words"
used by fellow conspirators in taped conversations. See, e.g.,
United States v. Elder, 90 F.3d 1110, 1134 (6th Cir. 1996), cert.denied, 117 S. Ct. 993 (1997); United States v. Flores, 63 F.3d
1342, 1359 (5th Cir. 1995); United States v. Saulter, 60 F.3d 270,
276 (7th Cir. 1995); United States v. DePeri, 778 F.2d 963, 977 (3d
Cir. 1985), cert. denied, 475 U.S. 1110 (1986). 
 Gaines seeks to distinguish the "code word" case law by
arguing that, in asking Allen Franklin what Geneva was "referring
to" when she mentioned Corwin Gaines and said "the man wants
money," the prosecutor went beyond seeking the witness's
explanation of a co-conspirator's use of certain words. We are not
so sure. See Garcia, 994 F.2d at 1505-06; Simas, 937 F.2d at 464-
65. As noted, Allen Franklin was intimately familiar with, and had
himself taken part in, the relevant events. He had also associated
closely with his grandmother in the conspiracy as well as in the
matters she was discussing. While we do not say the court was
required to have allowed the prosecutor's question in the form put,
it is hard to say the district court committed a "manifest abuse of
discretion" in allowing the question, given the evidence of Allen
Franklin's first-hand familiarity with the surrounding events and
conduct. See Alexis v. McDonald's Restaurants of Massachusetts,
Inc., 67 F.3d 341, 347 (1st Cir. 1995) (admissibility of lay opinion
testimony subject to review for manifest abuse of discretion). 
 Even, moreover, if the court were found to have abused
its discretion in allowing the question, there would be no reason
to reverse. It is doubtful, to begin with, whether Gaines's
unexplained objection preserved the issue he now argues. See Fed.
R. Evid. 103(a)(1). Clearly, it is not obvious how and whether
Federal Rule of Evidence 701 should be applied in this context. 
It is hard to say, therefore, that the specific ground for
objection was "apparent from the context," obviating any need to
state the specific ground for objection. If so, our review is
solely for "plain error," and Gaines clearly loses out. 
 But beyond that even if we were to rule that lodging an
unexplained objection sufficed to preserve the point and that the
district court had erred in admitting the testimony the error
would be harmless. See Fed. R. Crim. P. 52(a). Harmless error
analysis focuses on whether the error "had substantial and
injurious effect or influence in determining the jury's verdict,"
O'Neal v. McAninch, 513 U.S. 432, 436 (1995); compare Sullivan v.
Louisiana, 508 U.S. 275, 279 (1993); Harry T. Edwards, To Err is
Human, But Not Always Harmless: When Should Legal Error Be
Tolerated, 70 N.Y.U. L. Rev. 1167 (1995). 
 In contending that the jury's verdict was seriously
affected, Gaines makes much of the fact that the prosecutor stated
during closing argument that "If [Gaines was] not involved in any
way, why would his name be mentioned? Why would Allen Franklin's
grandmother name him as the supplier?" According to Gaines, this
statement demonstrates the importance placed on the improperly
admitted testimony, both by the prosecutor and, by inference, the
jury. However, even without Allen Franklin's explanation, Geneva
Franklin's testimony on its face implied that Gaines was the
supplier and that Allen owed him money. She explicitly explained
"Chico's" (Allen Franklin's) inability to get the best "stuff" as
resulting from a lack of "that money the man want." She then said,
"[t]he man called, Mr. Corwin Gaines, the other day." Being "the
man," Gaines would be the supplier. Hence, even without Allen
Franklin's gloss, the prosecutor could permissibly have argued
directly from her testimony, and the jury could have believed, that
Geneva had named Gaines as the supplier. Moreover, the prosecutor
emphasized to the jury that Geneva Franklin's words were but one
piece of the puzzle to be considered along with, inter alia, the
tape-recorded statements of co-conspirators Frank Turner and Larry
Eason (who also made mention of Gaines); the testimony of Allen
Franklin, Dana Franklin, and Amy Hatch (each of whom named Gaines
as the supplier); the testimony of the surveillance officers
concerning Allen Franklin's visits to Gaines; and the stash of
drugs uncovered in Gaines's apartment. 
 In the circumstances, Allen Franklin's permitted
explanation of Geneva Franklin's references in her taped remarks
was hardly of great moment. Given Allen Franklin's strongly
corroborated testimony of his visits to Gaines to procure crack
cocaine and of the fact that he was indebted to Gaines, his opinion
that Geneva was referring to Gaines and to Allen's indebtedness to
Gaines added little overall to the weight of the evidence before
the jury.
 B. Tara Ramos's Out-of-court Declaration
 Gaines claims error in the district court's refusal to
allow Officer David O'Sullivan to testify that Ramos said "Fucking
Franklin" when she saw Trooper Hartley remove a green garbage bag
containing crack cocaine during the police search of Gaines's
apartment. He argues on appeal that Ramos's utterance would have
corroborated Gaines's defense that the drugs belonged to Allen
Franklin, who had been allowed to store things in Gaines's
apartment including ostensibly unknown to Gaines drugs. Gaines
also points out that the prosecution made much of O'Sullivan's
testimony that Ramos became distraught, as did Gaines, when each
became aware that the green bag was being removed. According to
the prosecution, Ramos's and Gaines's reactions demonstrated
consciousness of guilt. Ramos's "Fucking Franklin" comment might
 according to Gaines have indicated some reason, other than
personal guilt, for Ramos, and Gaines himself, to have become
upset.
 The colloquy at trial relative to the "Fucking Franklin"
remark was laconic, to say the least. During cross-examination of
Officer O'Sullivan, defense counsel asked, "Did you hear Tara
[Ramos] say anything about Allen Franklin in an uncomplimentary
way?" The prosecutor objected and the court said, "Sustained." A
side bar conference followed at which defense counsel told the
judge that Tara said, "Fucking Franklin." The prosecutor stated,
"It's hearsay"; the court replied, "Yes"; defense attorney
proposed, "State of mind"; and the court responded, "No. Objection
sustained." That ended the matter. Appellant now claims that
exclusion of the comment was reversible error.
 On appeal, Gaines no longer cites the state of mind
exception to the hearsay rule, see Fed. R. Evid. 803(3), as a
ground for admitting the "Fucking Franklin" remark. Rather Gaines
says the statement was either not hearsay at all, being non-
assertive, or else should have come in under the excited utterance
exception to the hearsay rule. See Fed. R. Evid. 803(2). 
 A basic problem with Gaines's appellate arguments for
admission is that neither ground was presented to the trial court. 
Grounds not identified at trial on which rejected evidence is
admissible will ordinarily not provide a basis for reversal on
appeal. See Jack Weinstein, Weinstein's Federal Evidence 
103.20[5], at 103-37 & n.10 (2d ed. 1997). As Judge Pratt, writing
for a panel of the Second Circuit, stated some years ago,
 Frequently, it can be argued in good faith
 that what appears to be inadmissible under one
 exception to the hearsay rule can be admitted
 into evidence either as non-hearsay or under
 another of the hearsay exceptions. Unless the
 basis for proposed admission is obvious it is
 the burden of counsel who seeks admission to
 alert the court to the legal basis for his
 proffer.

United States v. Pugliese, 712 F.2d 1574, 1580 (2d Cir. 1983); seealso, e.g., United States v. Powell, 804 F.2d 895, 901 n.5 (7th Cir.
1990).
 Absent mention below, therefore, of the bases currently
advanced for admission, exclusion of the proffered "Fucking
Franklin" statement can be successfully raised on appeal only if
the district court's ruling amounted to plain error. Powell, 894
F.2d at 901 n.5. That standard is plainly not met here.
 We shall assume, without deciding, that there is merit to
one or even both of the grounds for admission now put forward. In
particular, the "excited utterance" exception, had it been
presented to the trial judge, seems a persuasive basis for
admission. Nonetheless, omission of the statement fell well short
of causing a "miscarriage of justice," an essential element of
plain error. See United States v. Olano, 507 U.S. 725, 736 (1993)
(quoting United States v. Young, 470 U.S. 1, 15 (1985)). We note
that Gaines himself gave a different explanation of why he became
distraught and never mentioned Ramos's utterance (nor did Ramos
herself ever attempt to mention her alleged utterance when she
testified.) Gaines testified the cause of his change in demeanor
was that one of the police officers told him that they had found
crack cocaine on his back porch and he was going to jail for a long
time. While Ramos's "Fucking Franklin" comment might still have
bolstered the defense's attribution of the drugs to Franklin, it
might equally have led the jury to think that Ramos knew more about
the bag's contents than she had acknowledged. Officer O'Sullivan
testified that the contents of the bag could not be seen. For
Ramos to react so strongly might suggest she knew all along they
contained drugs. The comment was also perfectly consistent with
her believing that Franklin was the informer who had turned them in
to the police, not merely the sole culprit himself. We further
note that another witness, Lina Grau, apparently mentioned Tara's
comment to the jury, although her testimony may have been blunted
by a ruling of inadmissibility. In any event, given the strength
of the government's evidence, and Gaines's and Tara's opportunity
to otherwise explain their defense, there was no miscarriage of
justice in the exclusion of Officer O'Sullivan's testimony
concerning Ramos's remark. 
 C. Testimony by IRS Special Agent Youngquist
 Gaines assigns error to certain opinion testimony by
Special Agent Lauren Youngquist of the Criminal Investigation
Division of the IRS. The government called Special Agent
Youngquist to testify regarding her investigation of Gaines's
finances in 1996. While she testified that she had been a special
agent for over nine years and had participated in 75 narcotics
cases for the IRS, she was never tendered as an expert witness, and
the court never expressly qualified her as such. Agent Youngquist
described her duties as assisting investigations, interviewing
witnesses, and looking at evidence. In this case, she testified to
comparisons between Gaines's income tax records and the funds he
expended. Her investigation revealed that Gaines's rent at the
Brookley address was $800 per month, which he always paid in cash,
excepting one payment via a money order. She discovered that
Gaines paid $175 cash for the apartment's alarm system and
approximately $8,000 cash for the audio/video system found in the
apartment, and that approximately $7,500 in cash was found in the
apartment. 
 Agent Youngquist then testified that she considered
Gaines's use of cash significant because it was "consistent with
drug dealing" and "very difficult to trace." While defense counsel
objected to this testimony, he offered no specific grounds for the
objection. 
 Gaines argues on appeal that it was prejudicial to allow
Agent Youngquist's testimony that using cash is "consistent with
drug dealing," both because the testimony lacked "helpfulness to
the jury" and because of "the grave danger of prejudice inherent in
such testimony." Gaines also states in his brief that Agent
Youngquist lacked the experience to render such an opinion, but
declares he does not now pursue that point because he made no
objection at trial concerning her lack of qualifications.
 We have discussed the use of expert testimony regarding
the operation of criminal schemes and activities in United Statesv. Montas, 41 F.3d 775, 781-84 (1st Cir. 1994). As we said there,
such testimony can be "helpful to juries in understanding some
obscure or complex aspect of the crime." Id. at 783. Expert
testimony is not admissible, however, on "matters that [are]
readily intelligible" and may, in some cases, create unfair
prejudice by appearing to put the expert's stamp of approval on the
government's case. Id. at 784. 
 We think that whether or not, in general, cash is used
in, and is consistent with, drug-dealing is a dubious subject, at
least in an ordinary case, for expert opinion testimony. As the
Second Circuit has stated, it "has a common sense aspect to it that
makes its admission more troubling." United States v. Tapia-Ortiz,
23 F.3d 738, 741 (2d Cir. 1994). It is hard to see here why the
jury needed Agent Youngquist's generalization given her detailed
testimony regarding Gaines's tax records and his various cash
purchases, all of which clearly highlighted the issue of the
sources of his cash and whether or not drug dealing was the likely
explanation. Compare id. at 741-42 (expert testimony upheld
identifying beepers, cash, and nicknames as drug trafficking
techniques when introduced to rebut defense claims that defendants'
activities did not suggest criminal conduct). 
 Had the defense objected on the express ground that this
testimony was not a proper subject of expert testimony under
Federal Rule of Evidence 702 or was unfairly prejudicial under
Federal Rule of Evidence 403, it might well have been error for the
court to have allowed Agent Youngquist to respond as she did. But
as occurred in Montas, defendant objected but stated no grounds. 
We accordingly review for plain error only. Id. For much the same
reasons stated in Montas, any error that occurred fell short of
being "plain." See id. Indeed, the questions asked and answered
seem less potentially prejudicial than those in Montas. The
claimed interrelationship between the drug transactions ascribed to
Gaines and his use of significant cash sums were issues already
fully on the table. That cash might be used because it is
difficult to trace, and that cash was "consistent with" drug
dealing, could hardly have been very novel or startling ideas to
this jury.
 D. The Prosecutor's Cross-examination of Gaines
 Gaines contends that the prosecutor erroneously asked him
during cross-examination to comment on the credibility of other
witnesses, and compounded the error by highlighting this exchange
during his closing argument to the jury. 
 Towards the close of his cross-examination, the
prosecutor asked Gaines nine times to comment on the testimony of
other witnesses or evidence previously introduced:
Q: And when Dana Franklin got on the stand and
 identified you as the crack dealer, he was wrong,
 right?
A: Yes, he was.
Q: And when all those people on the tapes identified
 you as the crack dealer, they were wrong, right?
A: I never heard anyone identify me as the crack
 dealer.
Q: Did you hear Geneva Franklin say, Mr. Corwin
 Gaines has got the stuff? Remember that tape?
A I heard her say, he's got the stuff.
Q: And she's wrong, right?
A: I never heard her say what stuff.
Q: If there's a voice on that tape, Mr. Gaines, that
 identifies you as a crack dealer, that voice
 would be wrong?
A: Yes, it would be.
Q: And Allen Franklin when he got on the stand --
A: Would be lying.
Q: He would be wrong, too?
A: Yes.
Q: And Amy Hatch, she's wrong, too?
A: Yes, she is.
Q: And even Brian Halliday when he said these were
 the books --
A: He never said these were books.
Q: He was wrong if he did, though, right? He was
 wrong if that's what he said to this jury?
A: He didn't say that.
Q: Well, let's set that aside, Mr. Gaines. And your
 own mother when she testified that video
 projector, she's wrong, too, right?
A: If those are your words.
Q: Weren't they hers?
A: Similar to it, yes, they were.
Q: And if she says it looked just like that, she
 would be wrong, too, right?
A: She didn't say that.

 The prosecutor alluded to this exchange during his
closing argument, stating: "And you decide if everyone else in
this case is either wrong or lying, even Brian Halliday about the
car books, even his own mother about the video equipment. Everyone
is wrong in this case, according to Mr. Gaines, except him."
 This circuit has held that it is improper for an attorney
to ask a witness whether another witness lied on the stand. United
States v. Fernandez, 145 F.3d 59, 64 (1st Cir. 1998); United Statesv. Sullivan, 85 F.3d 743, 750 (1st Cir. 1996); United States v.
Akitoye, 923 F.2d 221, 224 (1st Cir. 1991); cf. United States v.
Boyd, 54 F.3d 868, 871 (D.C. Cir. 1995); United States v. Richter,
826 F.2d 206 (2d Cir. 1987). Underlying this rule is the concept 
that credibility judgments are for the jury, not witnesses, to
make. Sullivan, 85 F.3d at 750. 
 The prosecutor here did not, however, ask the witness
whether he believed the others had lied. Instead, he asked whether
the other witnesses or voices on tape recordings were "wrong,"
rather than "lying." The witness was not required to choose
between conceding the point or branding another witness as a liar. 
See United States v. Gaind, 31 F.3d 73, 77 (2d Cir. 1994) ("Asking
a witness whether a previous witness who gave conflicting testimony
is 'mistaken' highlights the objective conflict without requiring
the witness to condemn the prior witness as a purveyor of
deliberate falsehood, i.e., a 'liar.'"). When Gaines finished the
prosecutor's statement by saying that Allen Franklin "[w]ould be
lying," the prosecutor's follow-up question clarified, "He would be
wrong, too?" Hence the "L" word was avoided. Whether this
avoidance would suffice in all situations, we need not decide now. 
As Gaines did not object in the district court to these questions
or to the prosecutor's closing argument, our review is limited to
plain error. Clearly that standard was not transgressed. The
prosecutor's technique was, moreover, duplicated by Gaines's own
counsel. 
 E. Allen Franklin's Testimony About Gaines's Defense
 Counsel

 Gaines asserts that the district court committed
reversible error in permitting Allen Franklin to testify that
Franklin had been represented in defending against a 1995 drug
charge by Michael Cioffi, one of Gaines's lawyers in the present
case, and that Gaines was the person who had referred Cioffi to
Franklin. According to Gaines, this testimony was unduly
prejudicial in that it gave the jury an impression that Gaines had
associated himself with a "drug lawyer." 
 In our view, Gaines's defense that he barely knew
Franklin and was unaware of Franklin's involvement with drugs 
made Gaines's referral of an attorney to Franklin to defend him
against a drug-related charge highly relevant. The government had
a right to present evidence that such a referral had been made. 
However, the actual identity of the lawyer referred by Gaines was 
irrelevant for this purpose. Testimony that the attorney in
question was Mr. Cioffi, Gaines's trial counsel, needlessly
injected Gaines's lawyer into the factual fabric of the case and
created the troubling possibility that Gaines's choice of a trial
attorney could be used by the jury to draw a negative inference
about Gaines's involvement with drugs. Thus viewed, Franklin's
testimony that Gaines referred him to Mr. Cioffi has arguable Sixth
Amendment right-to-counsel implications.
 Whether admission of the evidence was not only
inappropriate but error is another matter, however. The
presentation of this issue at sidebar was not as clear as it should
have been. Defense counsel never urged that, if the court found
the testimony generally relevant, it at least should exclude the
attorney's name. We need not resolve whether the point was
adequately preserved, however, because, in the context of the
entire case, any error was harmless. The standard for determining
harmless error is "whether we can say with fair assurance . . .
that the judgment was not substantially swayed by the error." 
Vincent v. Louis Marx & Co., Inc., 874 F.2d 36, 41 (1st Cir. 1989). 
There was compelling evidence establishing Gaines as Franklin's
supplier of drugs. Moreover, we note that the evidence about
Franklin and Mr. Cioffi did not implicate Gaines directly in the
criminal activity charged. See United States v. Figeroa, 976 F.2d
1446, 1455 (1st Cir. 1992). Given that the government did not refer
to this evidence in its argument to the jury, and in light of the
strong evidence against Gaines, we are convinced that the error was
harmless because it is "'highly probable' that the error did not
contribute to the verdict." United States v. Arias-Montoya, 967
F.2d 708, 714 (1st Cir. 1992). 
 F. The District Court's Refusal to Allow a Surrebuttal
 Witness

 We likewise accord little weight to Gaines's argument
that the court below erred in refusing to allow him to call a
surrebuttal witness, Tina Graham. In his case-in-chief, Gaines
called James Harris, who testified that Gaines had been with him on
a tour of comedy clubs on certain dates, including several of those
named in the indictment. Ostensibly to assist his testimony,
Harris referred to his 1996 datebook, which contained notations in
red ink confirming his testimony about the dates Gaines was out of
town with him. In rebuttal, the prosecution called U.S. Secret
Service Senior Document Examiner Larry Stewart, who testified that
scientific analysis revealed that particular kind of red ink
appeared nowhere else in Harris's datebook. The unstated
inference, of course, was that Harris had added the notations in a
fraudulent attempt to lend credence to his testimony. The court
then refused to permit Gaines to call a surrebuttal witness, Tina
Graham, to testify that she was with Gaines at a comedy club in New
Jersey on June 13, 1996, one of the dates in question. 
 A trial court has great discretion over the permissible
scope of testimony in surrebuttal, F.W. Woolworth Co. v.
Contemporary Arts, Inc., 193 F.2d 162, 166-67 (1st Cir. 1951), and
that discretion was plainly not abused here. Ordinarily,
surrebuttal should be allowed "only to explain away new facts
brought forward by the proponent in rebuttal, or evidence to
impeach witnesses who testified in rebuttal[.]" Id. Here, Tina
Graham's testimony would have done neither. First, the issue of
Gaines's whereabouts on June 13, 1996 was raised prior to the
prosecution's rebuttal, by Gaines in his own case-in-chief. Thus,
Gaines had the opportunity to call Graham at that time but elected
not to do so. Second, Graham's testimony would not have impeached
Senior Document Examiner Larry Stewart, as her testimony did not
concern him or his ink analysis. The district court did not exceed
its discretion in declining to allow her to be called as a
surrebuttal witness.

 III.
 Gaines argues that the cumulative effect of the errors he
alleges should lead to reversal even if, looked at individually,
each particular error is found insufficient. Our review of the
record indicates that Gaines received a full and fair opportunity
to present his defenses. Neither separately nor cumulatively do we
find a basis to reverse in the alleged errors. We add that counsel
has argued on appeal with notable competence.
 Affirmed.